# NACHMAN CORP. *v.* PENSION BENEFIT GUARANTY CORPORATION ET AL.

No. 78–1557. Argued January 7, 1980—Decided May 12, 1980

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. STEWART, J., filed a dissenting opinion, in which WHITE, POWELL, and REHNQUIST, JJ., joined, *post*, p. 386. POWELL, J., filed a dissenting opinion, *post*, p. 396.

*Robert W. Gettleman* argued the cause for petitioner. With him on the briefs were *Lawrence R. Levin, Joel D. Rubin,* and *H. Debra Levin.*

*Henry Rose* argued the cause for respondent Pension Benefit Guaranty Corporation. With him on the brief were *Mitchell L. Strickler* and *George Kaufmann. M. Jay Whitman* argued the cause for respondent International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. With him on the brief was *John A. Fillion.**

MR. JUSTICE STEVENS delivered the opinion of the Court.

On September 2, 1974, following almost a decade of studying the Nation's private pension plans, Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. § 1001 *et seq.* As a predicate for this comprehensive and reticulated statute,[1] Congress made de-

---

*Thomas C. Walsh* and *Juan D. Keller* filed a brief for Concord Control, Inc., as *amicus curiae* urging reversal.

*George J. Pantos, Otis M. Smith,* and *David M. Davis* filed a brief for General Motors Corp. as *amicus curiae* urging affirmance.

[1] Title I of ERISA, § 2 *et seq.,* 29 U. S. C. § 1001 *et seq.,* requires administrators of all covered pension plans to file periodic reports with the Secretary of Labor, mandates minimum participation, vesting and funding schedules, establishes standards of fiduciary conduct for plan administrators, and provides for civil and criminal enforcement of the Act. Title II, ERISA § 1001 *et seq.,* amended various provisions of the Internal Revenue Code of 1954 pertaining to qualification of pension plans for special tax treatment, in order, among other things, to conform to the standards set forth in Title I. Title III, ERISA §§ 3001–3043, 29 U. S. C. § 1201 *et seq.,* contains provisions designed to coordinate enforcement efforts of different federal departments, and provides for further study of the field. And, most relevant in this case, Title IV, ERISA §§ 4001–4082, 29 U. S. C. § 1301 *et seq.,* created the Pension Benefit Guaranty Corporation (PBGC)

tailed findings which recited, in part, "that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; [and] that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits. . . ." ERISA § 2 (a), 29 U. S. C. § 1001 (a). As one of the means of protecting the interests of beneficiaries, Title IV of ERISA created a plan termination insurance program that became effective in successive stages. The question in this case is whether former employees of petitioner with vested interests in a plan that terminated the day before much of ERISA became fully effective are covered by the insurance program notwithstanding a provision in the plan limiting their benefits to the assets in the pension fund.

Stated in statutory terms, the question is whether a plan provision that limits otherwise defined, vested benefits to the amounts that can be provided by the assets of the fund prevents such benefits from being characterized as "nonforfeitable" within the meaning of § 4022 (a) of ERISA, 29 U. S. C. § 1322 (a).[2] If the benefits are "nonforfeitable," they are insured by the Pension Benefit Guaranty Corporation (PBGC) under Title IV.[3] And if insurance is payable to the

---

and a termination insurance program to protect employees against the loss of "nonforfeitable" benefits upon termination of pension plans that lack sufficient funds to pay such benefits in full.

[2] That section provides, in part:

"Subject to the [dollar] limitations contained in subsection (b) [see n. 23, *infra*], the [PBGC] shall guarantee the payment of all nonforfeitable benefits (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under the terms of a plan which terminates at a time when section 4021 applies to it." 88 Stat. 1016.

[3] Section 4002 (a), 88 Stat. 1004, 29 U. S. C. § 1302 (a), provides:

"There is established within the Department of Labor a body corporate to be known as the Pension Benefit Guaranty Corporation. In carrying out its functions under this title, the corporation shall be administered by the chairman of the board of directors in accordance with poli-

former employees, the PBGC has a statutory right under § 4062 (b) to reimbursement from the employer.[4] It was petitioner's interest in avoiding liability for such reimbursement that gave rise to this action for declaratory and injunctive relief.

The relevant facts are undisputed. In 1960, pursuant to a collective-bargaining agreement, petitioner established a pension plan covering employees represented by the respondent union at its Chicago plant. The plan, as amended from time to time, provided for the payment of monthly benefits computed on the basis of age and years of service at the time of retirement.[5] Benefits became "vested"—that is to say, the

_____

cies established by the board. The purposes of this title, which are to be carried out by the corporation, are—

"(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,

"(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this title applies, and

"(3) to maintain premiums established by the corporation under section 4006 at the lowest level consistent with carrying out its obligations under this title."

[4] Section 4062 (b), 88 Stat. 1029, 29 U. S. C. § 1362 (b), provides in part:

"Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—

"(1) the excess of—

"(A) the current value of the plan's benefits guaranteed under this title on the date of termination over

"(B) the current value of the plan's assets allocable to such benefits on the date of termination, or

"(2) 30 percent of the net worth of the employer. . . ."

In other words, the employer must reimburse the PBGC for payments made from PBGC funds to cover nonforfeitable benefits to the extent that the pension fund was unable to pay them, but in no event is the employer liable to the PBGC for more than 30% of its net worth.

[5] Like the plan described in *Alabama Power Co.* v. *Davis*, 431 U. S. 581, 593, n. 18, "[p]etitioner's plan is a 'defined benefit' plan, under which

employee's right to the benefit would survive a termination of his employment—after either 10 or 15 years of service. The 15-year vesting provisions would not have complied with the minimum vesting standards in Title I of ERISA that were to become effective on January 1, 1976,[6] the day after termination of the plan.

Petitioner agreed to, and did, make regular contributions sufficient to cover accruing liabilities, to pay administrative expenses, and to amortize past service liability over a 30-year period.[7] Consistent with the agreement and with accepted actuarial practice, it was anticipated that the plan would not be completely funded until 1990.

Petitioner retained the right to terminate the plan when the collective-bargaining agreement expired merely by giving 90 days' notice of intent to do so. The agreement specified that upon termination the available funds, after payment of expenses, would be distributed to beneficiaries, classified by age and seniority, but only to the extent that assets were

---

the benefits to be received by employees are fixed and the employer's contribution is adjusted to whatever level is necessary to provide those benefits. The other basic type of pension is a 'defined contribution' plan, under which the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide." ERISA's termination insurance program does not apply to defined contribution plans, see § 4021 (b) (1), 29 U. S. C. § 1321 (b) (1), for the reason that under such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits.

[6] ERISA § 211 (b) (2), 29 U. S. C. § 1061 (b) (2). The provision for vesting of normal and early retirement rights after 10 years of service would have complied with the new standards unless, as petitioner argues, the clause disclaiming direct liability of the employer for benefits not sufficiently covered by the pension fund prevented the benefits from being "nonforfeitable" within the meaning of ERISA § 3 (19), 29 U. S. C. § 1002 (19). See discussion in n. 10, and Part III, *infra,* at 384–385.

[7] Persons employed by the company when the plan was created were entitled to credit for their prior years of employment in calculating both their eligibility for pensions and the amount of their benefits on retirement.

available. The critical provision of the agreement, Art. V, § 3, stated:

> "Benefits provided for herein shall be only such benefits as can be provided by the assets of the fund. In the event of termination of this Plan, there shall be no liability or obligation on the part of the Company to make any further contributions to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid." App. 24.[8]

In 1975 petitioner decided to close its Chicago plant. Its collective-bargaining agreement expired on October 31, 1975, and it terminated the pension plan covering the persons employed at that plant on December 31, 1975, the day before ERISA would have required significant changes in at least the vesting provisions of the plan. At that time 135 employees had accrued benefits with an average value of approximately $77 per month. Those benefits were concededly "vested in a contractual sense."[9] The assets in the fund were sufficient to pay only about 35% of the vested benefits.

In 1976 petitioner filed an action against the PBGC, seeking a declaration that it has no liability under ERISA for any failure of the plan to pay all of the vested benefits in full,

---

[8] By quoting only the first of these two sentences, MR. JUSTICE STEWART's dissenting opinion creates the impression that this provision is part of the plan's definition of benefits. Reading the two sentences together, however, makes it clear that the provision is simply a typical disclaimer of employer liability for any deficiency in the assets of the fund.

MR. JUSTICE STEWART's dissenting opinion quotes at length from Art. X, § 3, the plan provision determining the order of distribution of fund assets upon termination. Post, at 389–390, n. 7. Again, that provision does not purport to be a part of the definition of benefits, but simply provides a schedule for the distribution of benefits upon termination. Moreover, the dissent is quite wrong in stating that this distribution provision may have become illegal after December 31, 1975, post, at 390, n. 8. If that provision has been superseded, it was by § 4044, 29 U. S. C. § 1344, see n. 32, infra, which became effective on September 2, 1974.

[9] Brief for Petitioner 28.

and an order enjoining the PBGC from taking actions inconsistent with that declaration. The District Court accepted petitioner's contentions that the limitation of liability clause in the plan was valid on the date of termination, that the clause prevented the benefits at issue from being characterized as "nonforfeitable," and that petitioner was therefore entitled to summary judgment. 436 F. Supp. 1334 (ND Ill. 1977).

The Court of Appeals for the Seventh Circuit reversed. 592 F. 2d 947 (1979). Relying on the definition of "nonforfeitable" in Title I of ERISA,[10] the court concluded that the limitation of liability clause merely affected the extent to which the benefits could be collected, without qualifying the employees' rights against the plan. This conclusion was buttressed

---

[10] The definition section of Title I, § 3, 88 Stat. 833, 836, 29 U. S. C. § 1002, provides that "[f]or purposes of this title:

. . . . .

"(19) The term 'nonforfeitable' when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan. For purposes of this paragraph, a right to an accrued benefit derived from employer contributions shall not be treated as forfeitable merely because the plan contains a provision described in section 203 (a)(3)."

Section 203 (a)(3), 29 U. S. C. § 1053 (a)(3), also part of Title I, provides that the right to accrued benefits shall not be treated as forfeitable merely because the plan provides that they are not payable under certain specified conditions, such as the death or temporary re-employment of the participant. None of the listed conditions relates to insufficient funding.

Section 203 (a) is a central provision in ERISA. It requires generally that a plan treat an employee's benefits, to the extent that they have vested by virtue of his having fulfilled age and length of service requirements no greater than those specified in § 203 (a)(2), as not subject to forfeiture. A provision in a plan which purports to sanction forfeiture of vested benefits for any reason, other than one listed in subsection (a)(3), would violate this section after January 1, 1976, its effective date. Thus, if we were to accept petitioner's argument that the limitation of direct liability clause renders the vested benefits forfeitable within the meaning of the Title I definition, that clause would be invalid after January 1, 1976.

by a comprehensive review of the legislative history in which Judge Sprecher noted that the words "vested" and "nonforfeitable" had been used interchangeably throughout the congressional reports and debates, that the specific purpose of Title IV insurance was to protect employees from the kind of risk presented here (insufficient funds in the plan to cover vested benefits at termination), and that a contrary holding "would totally subvert the Congressional intent." [11]

Having construed the statute as it did, the Court of Appeals was required to confront petitioner's constitutional argument that the imposition of a retroactive liability for the payment of unfunded, vested benefits that was not assumed under the collective-bargaining agreement, violates the Due Process Clause of the Fifth Amendment. The Court of Appeals agreed that ERISA was not wholly prospective in that it applies to pension plans in existence before the effective date of the Act. It concluded, however, that Congress had adequately tempered the Act's burdens on employers and that those burdens were sufficiently justified by the public purposes supporting the legislation.[12]

---

[11] 592 F. 2d, at 958.

[12] "Perhaps the most important facts distinguishing ERISA from the Minnesota statute in *Allied Structural Steel [Co.* v. *Spannaus,* 438 U. S. 234,]* are those revealing the Congressional attempt to moderate the impact of the liability imposed. Title IV provisions represent a rational attempt to impose liability only to the extent necessary to achieve the legislative purpose. Congress concluded that it was necessary to insure unfunded vested benefits and established a federal corporation for that purpose. However, it was also determined that it would not be possible to maintain an effective insurance program without imposing some liability on employers. The abuses employer liability was designed to cure included terminations motivated by a desire to avoid the continued burden of funding. III Legislative History at 4741 (remarks of Sen. Williams); II Legislative History at 3382 (remarks of Rep. Gaydos). Congress was also concerned that without the risk of liability, employers might use promises of higher retirement benefits for bargaining leverage, knowing that the PBGC would be required to fulfill the promise. S. Rep. No. 93–383, I Legislative History at 1155. It was also believed that to impose liability

The petition for certiorari sought review of both the constitutional question and the question whether the statute had been properly construed to impose continuing liability on an employer that had lawfully terminated its plan prior to the effective date of the minimum vesting standards contained in Title I of ERISA. We granted certiorari, but limited our review to the statutory question. 442 U. S. 940.

Petitioner urges us to adopt a construction of the statute that would avoid the necessity of confronting constitutional questions,[13] and correctly points out that new rules applying

---

would cause employers to assume a more responsible funding schedule. II Legislative History at 1873 (remarks of Sen. Griffin). These first two considerations would not have been relevant in the Minnesota scheme because no agency was established to assume primary responsibility for the payment of benefits.

"Acknowledging that employers on the verge of bankruptcy would be unlikely to terminate pension plans solely to take advantage of termination insurance, Congress provided net worth limitations on the amount of potential liability. 29 U. S. C. § 1362. Congress also devised other provisions to temper the burdens imposed. Employers will not necessarily be liable for the full amount of benefits promised in the plan, since Congress set a level on the amount of benefits guaranteed. 29 U. S. C. § 1322 (b)(3). In Section 1323 Congress required the PBGC to provide optional insurance to an employer who desires to protect against this contingent liability. Finally, Title IV grants the PBGC discretion to arrange reasonable terms for the payment of liability. 29 U. S. C. § 1367. Thus Title IV of ERISA, unlike the statutes invalidated under Due Process or the Contract Clause does have 'limitations as to time, amount, circumstances, [and] need.' *W. B. Worthen Co.* v. *Thomas*, 292 U. S. [426,] 434. . . .

"The record supporting the enactment of ERISA, wholly unlike that present in *Allied Structural Steel*, demonstrates that 'the presumption favoring "legislative judgment as to the necessity and reasonableness of a particular measure" ' *must* be allowed to govern here. 438 U. S., at 247. . . . *Turner Elkhorn Mining*, 428 U. S., at 18, 19 . . . ; *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 488 . . . (1955). Title IV of ERISA satisfies Nachman's rights to Due Process." 592 F. 2d, at 962–963 (footnotes omitted).

[13] See, *e. g., Rescue Army* v. *Municipal Court*, 331 U. S. 549, 568–569.

to pension funds "should not be applied retroactively unless the legislature has plainly commanded that result." *Los Angeles Dept. of Water & Power* v. *Manhart,* 435 U. S. 702, 721. But petitioner's argument for reversal relies primarily on the language of the statutory definition of "nonforfeitable" contained in Title I, see n. 10, *supra.* If the Title I definition determines which benefits are insured under Title IV, benefits are not insured unless they are "unconditional" and "legally enforceable against the plan." Since petitioner's plan expressly states that benefits "shall be only such benefits as can be provided by the assets of the fund," petitioner argues that those elements of the statutory definition are not satisfied. Therefore, the benefits are forfeitable and necessarily uninsurable. Thus, petitioner concludes, it is not liable to anyone under the statute for the fund's inability to cover all vested benefits. Petitioner submits that this result is consonant with Congress' decision to postpone the effective date of the minimum vesting and funding requirements of Title I until January 1, 1976. Petitioner interprets that postponement as having been intended, among other things, to allow employers the opportunity to avoid the harsh consequences of the statute's retroactive application by freely terminating their plans at any time prior to that date.

We must reject petitioner's argument. We first note that the plan provision on which petitioner relies, *supra,* at 365, read as a whole, merely disclaims direct employer liability and imposes no condition on the benefits. See n. 8, *supra,* and n. 17, *infra.* Thus, petitioner's argument is not supported by a purely literal reading of the definition on which it relies and is inconsistent with the clear language, structure and purpose of Title IV. Since we construe petitioner's plan as containing only an employer liability disclaimer clause, we cannot accept its statutory argument without virtually eviscerating Title IV as applied to plans terminating prior to January 1, 1976. Such a result not only would be contrary to the four-stage phase-in of the program of insurance and employer

liability designed by Congress, but also would impose an extraordinarily harsh and plainly unintended burden on employers by operation of Title I after that date. We first consider petitioner's textual argument divorced from the statute as a whole; we next examine the structure and history of Title IV; and we finally explain how petitioner's proposed construction would distort the orderly phase-in of the statutory program designed by Congress.

## I

The statutory issue presented in the case is whether petitioner's employees' benefits are "nonforfeitable . . . under the terms of a plan" within the meaning of § 4022 (a) of the Act. See n. 2, *supra*. Petitioner concedes that its employees' benefits are "vested in a contractual sense." The question is whether such benefits were insured under Title IV when the plan was terminated even though the plan expressly provided that petitioner was not liable if the plan's assets were insufficient to cover them.

The key statutory term, "nonforfeitable benefits," is nowhere defined in Title IV. Petitioner relies on the definition of "nonforfeitable" in Title I, § 3 (19), see n. 10, *supra*. But definitions in that section are not necessarily applicable to Title IV, because they are limited by the introductory phrase, "For purposes of this title." [14] Nothing in the statute or its legislative history tells us why the Title I definition of "non-

---

[14] The argument that the definition of "nonforfeitable" in § 3 (19) is directly applicable only in Title I is reinforced by the fact that Title I definitions are occasionally expressly incorporated by reference in Title IV. See, *e. g.*, § 4021 (a) (1), 29 U. S. C. § 1321 (a) (1), which provides in part, "this section applies to any plan . . . which, for a plan year . . . is an employee pension benefit plan (as defined in paragraph (2) of section 3 of this Act). . . ." This specific incorporation suggests that Title I definitions do not apply elsewhere in the Act of their own force, though they may otherwise reflect the meaning of the terms defined as used in other Titles.

forfeitable" is not made expressly applicable to Title IV. The legislative history does disclose, however, that earlier versions of what finally emerged as the Title I definition would unquestionably have covered the benefits at stake in this litigation, and that those earlier versions applied to the entire Act including the termination insurance provisions.[15] If we assume that the original intent to have the definition apply to the entire statute survived the unexplained changes in the form of the definition, we should likewise assume that no change was intended in the substantive coverage of the insurance program. Indeed, as we shall demonstrate,[16] the latter assumption is supported by the legislative history. But even assuming, *arguendo,* that the Title I definition controls and even if the legislative history were less clear than it is, three aspects of the Title I definition itself refute petitioner's argument that the "nonforfeitable" character of a participant's rights should be determined by focusing on whether the employer is liable for any deficiency in the fund's assets.

First, the principal subject of the definition is the word "claim"; it is the claim to the benefit, rather than the benefit itself, that must be "unconditional" and "legally enforceable against the plan." It is self-evident that a claim may remain valid and legally enforceable even though, as a practical matter, it may not be collectible from the assets of the obligor.

Second, the statutory definition refers to enforceability against "the plan." The only practical significance of the contractual provision limiting liability is to provide protection

---

[15] For example, the bill originally introduced in the House defined "nonforfeitable pension benefit" as "a legal claim obtained by a participant or his beneficiary to that part of an immediate or deferred pension benefit, which notwithstanding any conditions subsequent which could affect receipt of any benefit flowing from such right, arises from the participant's service and is no longer contingent on continued service." H. R. 2, 93d Cong., 1st Sess., § 3 (20) (1973), 1 Legislative History of the Employee Retirement Income Security Act of 1974, 94th Cong., 2d Sess., 12 (Comm. Print 1976) (hereinafter Leg. Hist.).

[16] See nn. 24–27, *infra.*

for the employer. With or without such a clause, the pension fund could pay no more than the amount of assets on hand. Giving the employer protection against liability does not qualify the beneficiary's rights against the plan itself.[17]

Third, the term "forfeiture" normally connotes a total loss in consequence of some event rather than a limit on the value of a person's rights. Each of the examples of a plan provision that is expressly described as not causing a forfeiture listed in § 203 (a)(3), see n. 10, *supra,* describes an event—such as

---

[17] The dissenting opinions rely entirely on the form of the contractual provision protecting the employer against liability beyond its agreed contributions. Thus, if instead of stating that the benefits "shall be only such benefits as can be provided by the assets of the fund" the plan had said the benefits "shall only be recoverable from the assets of the fund," the dissenters would presumably agree that the benefits would be insured under Title IV. Nothing in the statute or its legislative history suggests that Congress intended the rights of the employees to hinge on any such purely formal difference between two plan provisions that would have precisely the same legal significance apart from the statute.

Indeed, under the dissenters' reading of the plan provision, insurance coverage would be unavailable regardless of the reason for the fund's inability to pay the vested benefits in full; whether the shortage resulted from insolvency of the employer, a defalcation by the trustees of the fund, or the unilateral termination before the plan was fully funded, Title IV insurance would be simply unavailable.

In the text, we explain at length why a clause limiting an employer's liability does not make otherwise vested benefits forfeitable within the meaning of the Act. The dissenters do not question the validity of any part of that explanation. Since what Mr. Justice Stewart describes as an "asset-sufficiency limitation," *post,* at 391, in the context of this case, is merely an example of such a clause, our explanation applies with full force to that formulation. Merely to assert that there is a "world of difference" between two forms of *employer* protection—without considering whether there is any reason to believe Congress intended such a difference to govern the availability of insurance protection for *employees*—is an unacceptable approach to the problem of statutory construction presented by this case. Understandably, the dissenting opinions do not suggest that there is anything in the legislative history of ERISA to support the view that the availability of insurance coverage should turn on the form of a plan provision disclaiming employer liability for unfunded benefits.

death or temporary re-employment—that might otherwise be construed as causing a forfeiture of the entire benefit. It is therefore surely consistent with the statutory definition of "nonforfeitable" to view it as describing the quality of the participant's right to a pension rather than a limit on the amount he may collect.

This reading of the Title I definition accords with the interpretation of the term "nonforfeitable" in Title IV adopted by the agency responsible for administering the Title IV insurance program. The PBGC has promulgated regulations containing a completely unambiguous definition of the term [18] and has been paying benefits to over 12,000 participants in terminated plans on the basis of this understanding of its statutory responsibilities.[19] We surely may not reject this

---

[18] The definition promulgated by the PBGC states that "a benefit payable with respect to a participant is considered to be nonforfeitable, if on the date of termination of the plan the participant (or beneficiary) has satisfied all of the conditions required of him under the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement, [or] the completion of a required waiting period. . . ." 29 CFR § 2605.6 (a) (1979).

Petitioner all but concedes that it loses if this definition accurately reflects the meaning of "nonforfeitable" in Title IV. Petitioner argues, in a footnote in its brief, that the word, "payable," modifies "benefit" in such a way as to exclude the benefits under its plan since liability of the employer to pay them was expressly disclaimed. If that is what the PBGC intended when it promulgated its definition, it has certainly chosen a strangely vague manner of making that intent known.

[19] The Treasury Department's definition of "nonforfeitable," 26 CFR § 1.411 (a)–4 (a) (1979), provides in part:

"Rights which are conditioned upon a sufficiency of plan assets in the event of a termination or partial termination are considered to be forfeitable because of such condition. However, a plan does not violate the nonforfeitability requirements merely because in the event of a termination an employee does not have any recourse toward satisfaction of his nonforfeitable benefits from other than the plan assets or the Pension Benefit Guaranty Corporation."

Because we read petitioner's plan as containing only an employer liability disclaimer clause, this case is clearly governed only by the second quoted

contemporary construction of the statute by the PBGC [20] without a careful examination of Title IV and its underlying legislative history to see what benefits Congress intended to insure.

## II

One of Congress' central purposes in enacting this complex legislation was to prevent the "great personal tragedy" [21] suffered by employees whose vested benefits are not paid when pension plans are terminated.[22] Congress found "that owing

---

sentence of the regulation. Moreover, we assume this accords with the Treasury Department's views, since the PBGC's brief was approved by the Treasury Department. See also n. 36, *infra*. Of course, a provision in a plan which is construed as a condition, the failure of which would cause a forfeiture, would be invalid after January 1, 1976. See n. 10, *supra*.

[20] Cf., *e. g.*, *E. I. du Pont de Nemours & Co.* v. *Collins*, 432 U. S. 46, 55.

[21] The quotation is from a statement by Senator Bentsen, the member of the Senate Committee on Finance most active in sponsoring ERISA, reprinted in 3 Leg. Hist. 4793.

[22] See, *e. g.*, the following statement by Senator Williams, a sponsor of the Senate version of ERISA:

"Another reason why so many employees have found their pension expectations to be illusory is that the employer may shut down, and if there are insufficient funds to meet the vested claims of the participants, they have no recourse.

"A classic case, of course, is the shutdown of Studebaker operations in South Bend, Ind., in 1963, with the result that 4,500 workers lost 85 percent of their vested benefits because the plan had insufficient assets to pay its liabilities.

"While this was a spectacularly tragic instance, it was by no means unique. Last year, for example, P. Ballantine and Sons, a substantial contributor to a multiemployer plan, sold its operations and withdrew from the plan.

"Because the plan did not have sufficient assets to cover vested liabilities, several hundred employees, with as many as 30 years service, will lose a substantial portion of their vested benefits.

"These, of course, are by no means isolated cases. According to a recently-issued study by the Departments of Labor and Treasury, over 19,000 workers lost vested benefits last year because of the termination of insufficiently funded plans." 2 Leg. Hist. 1599–1600.

to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits." ERISA § 2 (a), 88 Stat. 832, 29 U. S. C. § 1001 (a). Congress wanted to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it. The termination insurance program is a major part of Congress' response to the problem. Congress provided for a minimum funding schedule and prescribed standards of conduct for plan administrators to make as certain as possible that pension fund assets would be adequate. But if a plan nonetheless terminates without sufficient assets to pay all vested benefits, the PBGC is required to pay them—within certain dollar limitations not applicable here— [23] from funds established by that corporation.

---

[23] Section 4022 (b)(3), 88 Stat. 1017, 29 U. S. C. § 1322 (b)(3), provides:

"The amount of monthly benefits described in subsection (a) provided by a plan, which are guaranteed under this section with respect to a participant, shall not have an actuarial value which exceeds the actuarial value of a monthly benefit in the form of a life annuity commencing at age 65 equal to the lesser of—

"(A) his average monthly gross income from his employer during the 5 consecutive calendar year period (or, if less, during the number of calendar years in such period in which he actively participates in the plan) during which his gross income from the employer was greater than during any other such period with that employer determined by dividing $\frac{1}{12}$ of the sum of all such gross income by the number of such calendar years in which he had such gross income, or

"(B) $750 multiplied by a fraction, the numerator of which is the contribution and benefit base (determined under section 230 of the Social Security Act) in effect at the time the plan terminates and the denomina-

Throughout the entire legislative history, from the initial proposals to the Conference Report, the legislators consistently described the class of pension benefits to be insured as "vested benefits." [24] Petitioner recognizes, as it must, that the terms "vested" and "nonforfeitable" were used synonymously.[25]

tor of which is such contribution and benefit base in effect in calendar year 1974.

"The provisions of this paragraph do not apply to non-basic benefits."

In other words, Title IV generally limits guaranteed benefits to a worker's average monthly wage over the worker's best five years with the employer or $750 per month (adjusted for cost of living), whichever is lower. The last quoted sentence reflects that the PBGC is authorized to guarantee the payment of greater benefits, but is not required to do so. See § 4022 (c), 29 U. S. C. § 1322 (c).

[24] See, e. g., S. Rep. No. 93–127, pp. 2, 24 (1973), 1 Leg. Hist. 588, 610; H. R. Rep. No. 93–533, pp. 2, 14, 25 (1973), 2 Leg. Hist. 2349, 2361, 2372; Summary of Differences between the Senate and the House Version of H. R. 2, pp. 7–9 (1974), in 3 Leg. Hist. 5213–5215; H. R. Conf. Rep. No. 93–1280, p. 368 (1974), 3 Leg. Hist. 4635: "Under the conference substitute [which was adopted by both Houses], vested retirement benefits guaranteed by the plan (other than benefits vesting only because of the termination) are to be covered to the extent of the insurance limitations. . . ." MR. JUSTICE STEWART's dissent acknowledges this language from the Conference Report, post, at 393, but draws an unsupportable inference from it. He emphasizes that it is only " 'vested retirement benefits guaranteed by the plan' " that are insured. The emphasized language was used by the Conference Committee, however, not to describe the nature of vested benefits that were to be insured under Title IV, but to distinguish the rejected narrower House provision, under which only those benefits that Title I of ERISA required to be vested would be insured. H. R. Conf. Rep. No. 93–1280, supra, at 368, 3 Leg. Hist. 4635. See also 592 F. 2d, at 954, n. 9. Thus, the quoted language, which tracks the language of § 4022 verbatim—except that "vested" is used in place of "nonforfeitable"—merely underscores the intent to insure all vested benefits.

[25] Brief for Petitioner 28–29: "the Congressional history shows the use of the word 'vested' interchangeably with the word 'nonforfeitable'. . . ."

See also the definition contained in S. 4 as reported on April 18, 1973, § 3 (26), 1 Leg. Hist. 494–495, which, when proposed, applied to the

Since Title IV neither uses nor defines the term "vested," [26] it is reasonable to infer that the term "nonforfeitable" was intended to describe benefits that were generally considered

entire Act including the termination insurance provisions: " 'Nonforfeitable right' or 'vested right' means a legal claim obtained to that part of an immediate or deferred life annuity which notwithstanding any conditions subsequent which could affect receipt of any benefit flowing from such right, arises from the participant's covered service under the plan, and is no longer contingent on the participant remaining covered by the plan."

In that same version of the bill, the predecessor of § 4022 stated that the "insurance program shall insure participants . . . against loss of benefits derived from vested rights. . . ." S. 4 § 402 (a), 1 Leg. Hist. 532.

There is no explanation in the legislative history for the substitution of "nonforfeitable" for "vested." Since it is clear from the remainder of the legislative history that "vested" benefits were to be insured, we view the substitution of "nonforfeitable" for "vested" as formal only. The Court of Appeals' explanation for the substitution is plausible: "The substitution of terms might be explained by reference to the testimony of members from the Department of Labor at the hearings. The Department testified in 1973 that 'there is a problem of defining the accrued benefit which will be insured. . . . [W]e probably need to get some consistency between accrued benefits definition for purposes of Internal Revenue as well as for purposes of termination insurance.' *Hearings before the Subcommittee on Private Pension Plans of the Senate Committee on Finance,* 93rd Cong., 1st Sess., Part I at 437. Senator Bentsen responded with some interest in consistent definitions, although emphasizing it was vested benefits Congress intended to insure. *Id.,* at 443. The Internal Revenue Code used the word 'nonforfeitable,' rather than 'vested,' in its regulation of plan terminations pre-ERISA. *See* Treas. Reg. § 1.401–6 (1963)." 592 F. 2d, at 955, n. 10.

[26] There is a Title I definition of "vested liabilities," which provides that, "[t]he term 'vested liabilities' means the present value of the immediate or deferred benefits available at normal retirement age for participants and their beneficiaries which are nonforfeitable." ERISA § 3 (25), 88 Stat. 837, 29 U. S. C. § 1002 (25). Although, as noted earlier, see n. 14, *supra,* Title I definitions are not directly applicable to Title IV, it suffices to say that the synonymous use of "vested" and "nonforfeitable" in this definition as well as throughout the legislative history does not make any easier petitioner's task of distinguishing the two terms for Title IV purposes.

378

"vested" prior to the statute. And it is clear that the normal usage in the pension field was that even if the actual realization of expected benefits might depend on the sufficiency of plan assets, they were nonetheless considered vested.[27]

There is no evidence that Congress intended to exclude otherwise vested benefits from the insurance program solely because the employer had disclaimed liability for any deficiency in the pension fund. Indeed, there is strong evidence to the contrary. Congress understood that pension plans ordinarily contained disclaimer provisions of the sort petitioner relies on here.[28] Given that understanding, the Title

---

[27] "Under the pre-ERISA terminology, one author clarified that although benefit claims in fact were conditioned on the availability of funds in the trust, they were not to be considered conditional rights:

" 'In a basic contradiction to the pure legal concept of vesting, the Benefit under a pension plan that is described as vested, is, in the usual case . . . contingent . . . upon survival . . . [and] upon the availability of assets in the plan. In principle, however, this is no different from some other types of vested property rights such as those embodied in bonds and promissory notes that may not be honored at maturity because of the financial condition of the promisor. In essence, therefore, the vesting of a pension benefit simply means that the realization of the benefit is no longer contingent upon the individual's remaining in the service of the employer to normal retirement age.'

"D. McGill, Preservation of Pension Benefit Rights, 6 (1972). See also Departments of Treasury and Labor, Study of Pension Plan Terminations 1972, 19 (1973)." 592 F. 2d, at 953–954.

[28] See S. Rep. No. 92–634, Interim Report of Activities of the Private Welfare and Pension Plan Study, 1971, Senate Committee on Labor and Public Welfare, p. 74 (1972): "Employers ordinarily have no financial responsibility for pension payments beyond the contributions they are committed to make."

See also remarks of Representative Erlenborn, 2 Leg. Hist. 3388:

"At the present time the legal foundation of pension plans is that the employer sets up a pension trust and promises to make periodic contributions into that trust. If there are sufficient assets, the employee will get the pension that has been described; if there are not, he does not get it; he gets something less. But the employer up until the present time gen-

IV insurance program would have been wholly inapplicable to most pension plans. Since only the few plans in which the employer had not disclaimed liability would have been covered, the only purpose in providing any insurance at all would be to protect employees against the risk of employer insolvency.[29]

But § 4062 (b)(2), 29 U. S. C. § 1362 (b)(2), see n. 4, *supra*—the reimbursement provision—demonstrates that insolvency was certainly not the only focus of Congress' concern. The very fact that § 4062 (b)(2) requires employers to reimburse the PBGC for the payment of insured benefits makes it clear that Congress not only was worried about plan terminations resulting from business failures but also was concerned about the termination of underfunded plans by solvent employers.[30] Of even greater significance is the pro-

---

erally has not made a promise to pay the pension, only to make periodic contributions."

Cf. S. Rep. No. 93–127, p. 10 (1973), 1 Leg. Hist. 596, noting that some "critics have proposed that corporate assets be committed to guarantee any pension obligations which exist at termination," which implies that the problem was largely due to the absence of any direct guarantee by the employer. That proposal was not adopted. Congress opted instead for the insurance system run by the PBGC, with limited employer liability over to the PBGC.

Cf. also Affidavit of Joseph E. Ellinger, Director of the Office of Program Operations of the PBGC: "Since September 2, 1974, the PBGC has assumed liability for approximately 136 insufficient pension plans terminating on or before December 31, 1975. . . . Of these plans, approximately 78 have limitation-of-liability provisions like the pension plan involved in this lawsuit." App. 74.

[29] Under petitioner's view, unless the employer is directly liable, the benefits are uninsured. Accepting that view, it would only be in a case in which an employer is insolvent that the insurance program would make any practical difference, since otherwise the employee could sue the employer directly.

[30] See remarks of Senator Williams following the conference, 3 Leg. Hist. 4741–4742: "Since there would be a possibility of abuse by solvent employers who terminate a plan and shift the financial burden to the

vision limiting the amount of employer liability for reimbursement to 30% of the employer's net worth. The 30% limit plainly contemplates the situation in which the employer has disclaimed direct liability; for if the employer were directly liable to the employees for the full amount of any funding deficiency, the 30% limitation would serve no useful purpose.[31] That this 30% limit would be meaningless unless the employer has disclaimed direct liability surely demonstrates that Congress did not intend such a disclaimer to

insurance program, notwithstanding their own financial ability to continue funding the plan, the conference bill imposes liability on employers whose plans terminate, to reimburse the program for benefits paid by the corporation. This liability extends to 30 percent of the employer's net worth."

Congress was not acting in a vacuum. The threat of terminations of underfunded plans by solvent employers was quite real. In a 1972 study of pension plan terminations, published in 1973 by the Departments of the Treasury and Labor, it was reported, p. 55, that "the great majority of claimants with losses, including high-priority claimants, are in plans of employers whose net worth substantially exceeds benefit losses." Indeed, "[o]ver-all, only 3 percent of claimants with losses were in plans where employer net worth was less than the value of benefits lost while 71 percent of the claimants with losses were in plans where employer net worth was at least 1,000 percent of claimant losses." *Id.*, at 61. This study was repeatedly relied on by Congress. See, *e. g.*, S. Rep. No. 93–127, p. 10 (1973), 1 Leg. Hist. 596; remarks of Senator Williams, n. 22, *supra;* remarks of Representative Thompson, one of the House conferees on the final bill, 3 Leg. Hist. 4665.

The 30% limitation reflects the fear expressed during the debates that if too great a burden is placed directly on employers, growth of pension plans would be discouraged. See remarks of Representative Erlenborn, 2 *id.*, at 3403.

[31] If the employer pays the unfunded portion of the benefits, there would be no need for insurance and, of course, no need for any reimbursement at all. On the other hand, if the employer is liable to the employees but has insufficient assets to pay the full benefits, there obviously would be insufficient funds to reimburse the PBGC and the 30% limit would therefore be irrelevant.

render otherwise vested benefits "forfeitable" within the meaning of § 4022.[32]

Petitioner's reading of the statute would limit any meaningful application of the insurance program prior to January 1, 1976, to only those cases involving insolvent employers that had not disclaimed direct liability. Since the legislative history clearly shows that Congress intended to cover terminations by solvent employers, and further shows that disclaimer clauses were widely used, petitioner is ultimately contending that Congress did not intend to create any significant employer reimbursement liability prior to January 1, 1976. This argument, however, is foreclosed by a consideration of the statutory provisions for successive increases in the burdens associated with plan terminations. Congress clearly did not offer employers an opportunity to make cost-free terminations at any time prior to January 1, 1976. Quite the contrary, one

---

[32] Another indication that benefits are not forfeitable within the meaning of Title IV solely because the employer has disclaimed direct liability is § 4044, 29 U. S. C. § 1344, which establishes the priority scheme for allocation of assets upon termination. The fifth priority is "all other nonforfeitable benefits under the plan." That implies that the four prior categories all involve nonforfeitable benefits as well, as one might expect. Subsection (b)(2) states the rule that if the assets "are insufficient to satisfy in full the benefits of all individuals [in any of the first four categories], . . . the assets shall be allocated pro rata among such individuals on the basis of present value (as of the termination date) of their respective benefits. . . ." Since this section thus contemplates that there may be insufficient funds in the plan to pay nonforfeitable benefits, it must be that benefits are not to be classified as forfeitable solely because there are insufficient funds to pay them. And it would make no sense administratively to provide for automatic pro rata distribution, as this section does, unless no additional funds are expected directly from the employer. If the employer is directly liable, it would make more sense to make any pro rata distribution after adding to the assets of the fund whatever funds could be gleaned directly from the employer. Therefore, this section indicates that Congress thought that benefits may be nonforfeitable even if an employer has disclaimed direct liability.

of the express purposes of ERISA was to discourage plan terminations. See n. 3, *supra*.

## III

We have previously noted the care with which Congress approached the problem of retroactivity in ERISA. See *Los Angeles Dept. of Water & Power* v. *Manhart,* 435 U. S., at 721–722, n. 40. Congress provided that Title IV should have an increasingly severe yet carefully limited impact on employers during four successive periods of time for single-employer plans. During each of these periods, however, it extended the same insurance protection to those beneficiaries of terminated plans having vested benefits under the terms of the plans.

Title IV became effective as soon as ERISA was enacted on September 2, 1974, § 4082 (a), 29 U. S. C. § 1381 (a), and indeed was expressly made partially retroactive in order to provide insurance coverage to participants whose plans terminated after June 30, 1974, § 4082 (b), 29 U. S. C. § 1381 (b). The measure of coverage, at the outset, was the difference between the employee's vested benefits under the terms of the plan (subject to the dollar limitations in § 4022 (b)(3), see n. 23, *supra*) and the amount that could be paid from the terminated plan's assets. However, the employer liability provision, § 4062, was not made effective at all during this initial period—June 30 to September 2, 1974. The PBGC was thus given no right to recover any part of the insured deficiencies from employers that terminated their plans before the Act became effective.[33]

---

[33] Since a disclaimer clause would protect an employer from liability to its employees, and since there was no contingent liability to the PBGC on account of terminations during this initial period in any event, it is difficult to identify a rational basis for conditioning the availability of plan termination insurance in this period on the absence of a disclaimer clause.

The second period lasted for 270 days after the enactment of ERISA, or until the end of May 1975. Again, the PBGC provided insurance coverage for most underfunded nonforfeitable benefits under the terms of a pension plan terminated during this period. But two important additional provisions became effective: § 4062 (b), the section creating employer liability to the PBGC, and § 4004 (f)(4), 88 Stat. 1009, 29 U. S. C. § 1304 (f)(4).[34] The latter authorized the PBGC to waive entirely, or to reduce, its right to recover insurance payments from any employer who could establish unreasonable hardship in situations in which the employer was not able, as a practical matter, to continue its plan in effect. Section 4004 (f)(4) unequivocally demonstrates that Congress had deliberately imposed a new liability upon an employer that terminated its plan during the first nine months of the operation of the Act. If the employer had a pre-existing contractual liability, there would have been no effective way for the PBGC to mitigate it in hardship cases, since the PBGC could not stop the employees from suing the employer directly. Moreover, there would have been no need for insurance except in cases of insolvency, and in such cases there would have been no practical reason for mitigation because recovery from the employer would have been impossible in any event. On the other hand, in the typical case in which the employer had protected itself from any contractual liability, the only possible source of employer liability was

---

[34] "(f) In addition to its other powers under this title, for only the first 270 days after the date of enactment of this Act the corporation may—

. . . . .

"(4) waive the application of the provisions of sections 4062, 4063, and 4064 to, or reduce the liability imposed under such sections on, any employer with respect to a plan terminating during that 270 day period if the corporation determines that such waiver or reduction is necessary to avoid unreasonable hardship in any case in which the employer was not able, as a practical matter, to continue the plan."

§ 4062's provision for the recovery by the PBGC of insurance payments made on account of unsatisfied nonforfeitable benefits. Petitioner's definition of nonforfeitable benefits as excluding from Title IV coverage all benefits for which the employer is not directly liable would have made § 4004 (f)(4) totally inapplicable in the only cases in which it could have possibly made any difference.

The third period lasted for about seven months until December 31, 1975, the termination date of petitioner's plan. Having terminated more than 270 days after the Act became effective, petitioner was not eligible for a hardship waiver. Its contingent liability, however, was smaller than it would have been had it terminated its plan in the fourth period. During the third period, the terms of the pension plan still measured the outer limits of the unfunded liability. Had petitioner waited another day to terminate, Title I's vesting standards would have become effective, thereby increasing the number of employees whose benefits would have become vested, see n. 6, *supra,* and therefore insurable under Title IV. Petitioner avoided this additional liability by terminating in the third period.

Under petitioner's reading of the statute, there was a much more dramatic difference between the third period and the fourth period than we have just described. The argument that an employer liability disclaimer clause renders a plan's benefits forfeitable has two draconian consequences: first, it makes the Title IV insurance program entirely inapplicable to most terminations before January 1, 1976; second, it makes such disclaimer clauses entirely invalid on and after that date. This latter conclusion flows directly from Title I's command that all covered pension plans provide nonforfeitable benefits on and after January 1, 1976. See n. 10, *supra.*

But Congress plainly did not intend to prevent employers from limiting their potential direct liability to their em-

ployees. There is not a word in the statute or its legislative history suggesting that Congress ever intended to outlaw the use of such clauses.[35] On the contrary, the inclusion of a limit on an employer's contingent reimbursement liability to the PBGC measured by 30% of its net worth would be inexplicable if Congress had intended to deny employers any right to place a contractual limit on their direct liability to their employees. We stress that petitioner's construction of the statute would therefore render meaningless § 4062 (b)'s 30% net worth limit on the employer's contingent liability to the PBGC for all terminations occurring after January 1, 1976. In light of the careful attention paid to when various provisions were to be effective, Congress surely would have made explicit any intent to limit this important provision to a mere transitionary role. It bears emphasis that Congress declined to adopt the suggestion that corporate assets be committed to guarantee any pension obligations which exist at termination.[36] The 30% provision was designed as a softer measure.[37]

In sum, petitioner reads the statute as authorizing cost-free terminations prior to January 1, 1976, and full liability for all promised benefits thereafter with neither dollar nor

---

[35] Indeed, since their use has unquestionably contributed to the growth of private pension plans, their prohibition would be inconsistent with Congress' repeatedly expressed intent to encourage the maintenance of pension plans.

[36] See n. 28, *supra*. The Internal Revenue Service has included an employer liability disclaimer clause in a model pension plan issued for guidance in drafting post-1976 plans. See CCH 1977 Pension Plan Guide ¶ 30,782.96.

[37] Further, under the reading of the statute we adopt, in the usual case an employer could not be liable for underfunded benefits beyond the dollar limitations on PBGC insurance payments. See n. 23, *supra*. But if an employer liability disclaimer clause were to be deemed invalid after January 1, 1976, those limits would not be applicable to protect the employer in lawsuits by employees brought directly against it.

net worth limitations. We are convinced that Congress envisioned a quite different scheme. Congress intended to discourage unnecessary terminations even during the phase-in period, and to place a reasonable ceiling on the potential cost of terminations during the principal life of the Act—the period after January 1, 1976. Although the impact of our holding on petitioner and others who lawfully terminated plans during the second half of 1975 may seem harsh, we have no doubt as to what Congress intended. We cannot give the statute a special reading for that brief period without distorting it for the remainder of its statutory life.

Accordingly, the judgment is

*Affirmed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE WHITE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, dissenting.

Title IV of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1301 *et seq.*, establishes a system of insurance to cover the termination of private pension plans. Under that Title, the Pension Benefit Guaranty Corporation (PBGC) must "guarantee the payment of all nonforfeitable benefits . . . under the terms of a [covered] plan which terminates."[1] In turn, the PBGC may sue the company that maintained the plan for such part of the "guaranteed" payment as exceeded on the date of termination the value of the plan's assets.[2]

---

[1] Title 29 U. S. C. § 1322 (a) more fully provides:

"[The PBGC] shall guarantee the payment of all nonforfeitable benefits (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under the terms of a plan which terminates at a time when section 1321 of this title applies to it."

Section 1322 (b) limits the amounts which the PBGC must so guarantee in respects not at issue here.

[2] 29 U. S. C. § 1362 (b)(1):

"Any employer [who maintained a plan at the time it was termi-

The Nachman plan was terminated on December 31, 1975, several months after Title IV had become fully applicable to pension plans such as the one maintained by the petitioner.[3] The issue in this case is, therefore, a narrow one: Whether, "under the terms of [the Nachman] plan," the plan's participants were entitled on the date of termination to "nonforfeitable benefits" in excess of the value of the funds that were then held by the plan.[4]

ERISA defines a "nonforfeitable benefit" as follows: [5]

"The term 'nonforfeitable' when used with respect to a

nated, see § 1362 (a) and the exceptions provided therein] shall be liable to the corporation, in an amount equal to . . . —

"(1) the excess of—

"(A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

"(B) the current value of the plan's assets allocable to such benefits on the date of termination. . . ."

A company's liability under § 1362 (b) (1) may not, however, exceed "30 percent of the net worth of the employer determined as of a day, chosen by the [PBGC] but not more than 120 days prior to the date of termination, computed without regard to any liability under this section." § 1362 (b) (2).

[3] See 29 U. S. C. § 1381 (a) ("The provisions of this subchapter take effect on September 2, 1974").

[4] If the answer to this inquiry is no, then under Title IV of ERISA the petitioner owes nothing to the PBGC. On the other hand, if the answer is yes, then the petitioner must pay the PBGC the amount by which the plan's "nonforfeitable benefits" exceeded on the termination date the value of the plan's assets, subject, of course, to the 30%-of-net-worth limitation contained in 29 U. S. C. § 1362 (b) (2) and the limitations set out in § 1322 (b).

[5] 29 U. S. C. § 1002 (19).

As the Court notes, § 1002 states that the definitions set out therein are "[f]or purposes of [Title I]." That the § 1002 (19) definition of "nonforfeitable benefit" is not expressly made applicable to Title IV appears, however, to be attributable to nothing but inadvertence. In the bill that passed the House and was sent to the Conference Committee, the minimum vesting provisions and the termination insurance provisions were

pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." [6]

located under one Title. See H. R. 2, as passed by the House, 93d Cong., 2d Sess. (Table of Contents) (1974), 3 Leg. Hist. 3898–3899. The definition of "nonforfeitable" now contained in § 1002 (19) was made applicable to that entire Title. H. R. 2, § 3 (1974), 3 Leg. Hist. 3903. The Conference Committee split the minimum vesting provisions and the termination insurance provisions into two separate Titles. As the definitional section had always been situated at the front of the minimum vesting provisions, it naturally followed those provisions into Title I of the bill as enacted into law.

It would severely strain credulity to infer from these events that Congress decided to leave to pure chance the proper definition of "nonforfeitable" for purposes of Title IV. "Nonforfeitable" is used in Title I as a term of art. Congress used the same word in critical portions of Title IV. Had it intended "nonforfeitable" to carry one meaning in Title I and another in Title IV, Congress would presumably have said so, particularly since the two Titles were considered and enacted in tandem and were meant to function as an interrelated system of protection. Title IV, however, sets out no separate definition of "nonforfeitable," even though that Title does contain a few definitions of its own. Furthermore, the Act's legislative history reveals no suggestion that the word's import should differ as between Title I and Title IV.

It follows that, insofar as the PBGC's own definition of "nonforfeitable," see 29 CFR § 2605.6 (a) (1979), departs from § 1002 (19), it must be rejected. Nothing in the Act or its legislative history reflects a congressional intent to give the PBGC the authority to define the scope of its own entitlement to employer assets.

House and Senate bills and debates are reprinted, along with the House, Senate, and Conference Reports, in a three-volume Committee Print entitled Legislative History of the Employee Retirement Income Security Act of 1974, Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 94th Cong., 2d Sess. (1976) (cited *supra* and hereafter as Leg. Hist.).

[6] The Court asserts that the language contained in § 1002 (19)—"which arises from the participant's service, which is unconditional, and which

No contention is made in this case that the benefits at issue did not arise from services rendered by the plan's participants. Rather, the petitioner's argument is that, in the words of the statute, "under the terms of [the Nachman] plan," the contested benefits were both "[c]onditional" and/or "legally [un]enforceable against the plan."

For present purposes, only two provisions of the now-terminated Nachman plan need be considered. First, a sentence in Art. V, § 3, stated: "Benefits provided for herein shall be only such benefits as can be provided by the assets of the Fund." Second, Art. X, § 3, stated:

> "In the event of termination of the Plan, the assets then remaining in the Fund, after providing the accrued and anticipated expenses of the Plan and Fund . . . shall be allocated . . . *to the extent that they shall be sufficient,* for the purposes of paying retirement benefits. . . ." (Emphasis added.) [7]

---

is legally enforceable against the plan"—modifies "claim" not "benefit." I disagree. The definition reads: "The term 'nonforfeitable' . . . means a claim . . . to *that part of a . . . benefit . . . which* arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." (Emphasis supplied.) But whether the operative language modifies "claim" or "benefit" would seem irrelevant for present purposes, in any event.

[7] Article X, § 3, of the Plan more fully provided:

"In the event of termination of the Plan, the assets then remaining in the Fund, after providing the accrued and anticipated expenses of the Plan and Fund, (including without limitation, expenses of terminating the Plan), shall be allocated by the Board [of Administration] on the basis of present actuarial values to the extent that they shall be sufficient, for the purposes of paying retirement benefits (the amount of which shall be computed on the basis of Credited Service to the date of termination of the Plan) in the following order or precedence:

"(a) To provide their retirement benefits to persons who shall have been Retired Employees and entitled to current benefits under the Plan prior to its termination, without reference to the order of retirement;

"(b) To provide Normal Retirement Benefits to Employees aged 65 or

These two provisions, neither of which was void on the date of termination,[8] rendered "conditional" every defined benefit set out in the plan. On termination, a participant's right to any benefit defined in dollar terms was expressly hinged on the plan's ability to pay that amount. Like any condition a plan might specifically place on a participant's entitlement to

over on the date of termination of the Plan, without reference to the order in which they shall have reached age 65;

"(c) . . . .

"(d) . . . .

"(e) . . . .

"(f) . . . .

"If, after having made provision in the above order of precedence for some but not all of the above categories, the assets then remaining in the Fund are not sufficient to provide completely for the benefits for Employees in the next category, such benefits shall be provided for each such Employee on a pro-rata basis." (Emphasis added.)

Contrary to the Court's suggestion, nothing in 29 U. S. C. § 1344 (allocation of assets of terminated defined-benefit plans) operated in any way to void the asset-sufficiency language of this provision in the Nachman plan. Section 1344 simply changed the order in which the assets held by the Nachman plan had to be allocated on termination to the plan's participants.

[8] The provisions would have been illegal after December 31, 1975, to the extent that they conflicted with the "minimum vesting standards" that came into effect for plans like the Nachman plan on January 1, 1976. See 29 U. S. C. § 1061 (b)(2). Those standards mandate that covered pension plans provide their participants with specified levels of "nonforfeitable" benefits. See § 1053. All covered plans must, for instance, "provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." In addition, a covered plan must provide employees who have participated in the plan for certain periods of time with specified minimum "nonforfeitable" percentages of their accrued benefits.

The Nachman plan—as a "defined benefit plan," see 29 U. S. C. §§ 1002 (23), (34), (35); Alabama Power Co. v. Davis, 431 U. S. 581, 593, n. 18— could not, after January 1, 1976, have continued to promise its fully vested participants a "nonforfeitable" right only to that part of their "accrued benefit" which could be funded by the plan. See 29 U. S. C. §§ 1002 (23), (34), (35), 1053, 1054.

a defined retirement benefit, this asset-sufficiency condition deprived the Nachman plan's defined benefits of "nonforfeitable" status to the extent that such benefits could not be defrayed by the plan's assets.[9] The Court does not explain why an asset-sufficiency limitation expressly set out in a pension plan is not a "condition" for purposes of determining the "nonforfeitability" of the plan's pension benefits.[10]

By reason of the cited sentences in Art. V, § 3, and Art. X, § 3, it must also be concluded that the only defined benefits of the plan which on termination were "legally enforceable against the plan" were those that were fully funded. Under contract law, a person is liable only for that which he has promised to pay. The Nachman plan promised each participant that upon termination he would receive, not a particular retirement benefit defined in dollar terms, but rather such a benefit only if it could be funded out of the plan's assets.

The Court notes that another sentence in Art. V, § 3, of the plan provided that, "[i]n the event of termination of this Plan, there shall be no liability or obligation on the part of the Company to make any further contributions to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid." But this sentence had an entirely different effect from that of the two provisions discussed above. Since it only purported to limit the *employer's* liability to the plan and not the *plan's* obligation to the plan's participants, the sentence in question neither

---

[9] As the Chairman of the House Committee on Education and Labor explained with regard to an earlier bill's definition of "nonforfeitable" almost identical to that contained in 29 U. S. C. § 1002 (19) as finally enacted: "The definition of the term 'nonforfeitable' is intended to preclude *any* conditions to receipt of vested benefits other than those noted in the definition." 2 Leg. Hist. 3306 (statement of Rep. Perkins) (emphasis supplied).

[10] To the extent that the PBGC's own self-serving definition in 29 CFR § 2605.6 (a) (1979) points in a different direction, it conflicts with the statute and can be accorded no weight. See n. 5, *supra*.

made the benefits provided by the plan "[c]onditional" nor rendered them "legally [un]enforceable against the plan." The Court is, therefore, quite correct in concluding that the sentence in question did not render "forfeitable" any of the retirement benefits provided by the Nachman plan.[11] What the Court misses is the world of difference between the employer disclaimer clause and the provisions in the plan that limited what the plan itself promised to provide its participants. Only the latter made the retirement benefits "forfeitable" for purposes of ERISA.[12]

Three aspects of ERISA's legislative history strongly support this interpretation of the statutory scheme. First, Congress discarded on its way to passing the Act a number of alternative definitions of the benefits to be insured, several of which if enacted would have read very much like the definition the PBGC has adopted and which the Court now holds embodies Congress' true intent.[13] Few principles of statu-

---

[11] Correspondingly, I agree that the sentence did not affect in any way the petitioner's liability to the PBGC under 29 U. S. C. § 1362 (b). The sentence in question purported only to absolve the petitioner of liability to the plan's trustee for asset shortfalls. Had the sentence also attempted to protect the petitioner from its liability to the PBGC under § 1362 (b), it would presumably have been void to that extent.

[12] I also agree, however, with the Court's conclusion that nothing in ERISA *nullifies* clauses that protect employers from direct liability to plan participants for deficiencies in plan assets.

[13] For instance, the bill originally passed by the Senate insured retirement benefits that were "nonforfeitable" under the terms of the plan. H. R. 2, as passed by the Senate, 93d Cong., 2d Sess., § 422 (a) (1974), 3 Leg. Hist. 3702. Only one definition of "nonforfeitable" was contained in the bill. This provided that a "nonforfeitable benefit" was a benefit "which, notwithstanding any conditions subsequent which would affect receipt of any benefit flowing from such right, arises from the participant's covered service under the plan and is no longer contingent on the participant remaining covered by the plan." *Id.*, § 502 (a) (20), 3 Leg. Hist. 3745. See also S. 4, 93d Cong., 1st Sess., §§ 3 (26), 3 (35), 401 (b), 402 (a), 502 (a) (20) (1973) (bill as reported by Senate Committee on Labor and Public Welfare), 1 Leg. Hist. 494–495, 497, 532, 543; S. 4, 93d Cong., 1st

tory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language. See *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 199–200.

Second, the Conference Report, in describing the bill that finally was enacted, stated that "vested retirement benefits *guranteed by the plan* . . . are to be covered" by the Act's insurance scheme. H.·R. Rep. No. 93–1280, p. 368 (1974), 3 Leg. Hist. 4635. (Emphasis added.) Only a benefit that is unconditionally promised by a plan is a benefit "guaranteed" by that plan.[14]

Third, Congress delayed the effective date of the Act's "minimum vesting standards" in order "to provide sufficient time for pension and profit-sharing retirement plans to adjust to the new vesting and funding standards, to make provision for additional costs which may be experienced, and to permit negotiated agreements to transpire. . . ." S. Rep. No. 93–127,

---

Sess., §§ 3 (26), 3 (35), 401 (b), 402 (a), 502 (a) (20) (1973) (bill as originally introduced in Senate), 1 Leg. Hist. 103, 105, 137, 148.

Similarly, the bill reported to the House on October 2, 1973, by the House Committee on Education and Labor provided termination insurance for "vested liabilities." See H. R. 2, as amended, §§ 401 (b), 402 (a), 404 (b) (1973), 2 Leg. Hist. 2320, 2320–2321, 2325. Under the bill, "vested liabilities" were defined as "the present value of the immediate or deferred benefits available at regular retirement age for participants and their beneficiaries which are nonforfeitable and which are no longer contingent on continued service or any other obligation to the employer, sponsoring organization or other party in interest." H. R. 2, as amended, § 3 (25), 2 Leg. Hist. 2256. In turn, the bill defined "nonforfeitable benefit" as a benefit "which arises from the participant's service and is no longer contingent on continued service or any other obligation to the employer, sponsoring organization, or other party in interest." H. R. 2, as amended, § 3 (19), 2 Leg. Hist. 2251–2252.

[14] See also 3 Leg. Hist. 4668 (Rep. Dent) (Termination insurance "will provide a backup guarantee to every pension plan that, regardless of the economic fortunes of the companies sponsoring the plan, *its obligations* will be met." (Emphasis supplied.)).

p. 36 (1973), 1 Leg. Hist. 622. Disregarding this intent, the Court today effectively rewrites the Nachman plan to make it promise more than it actually did.

Nothing in the legislative history, on the other hand, truly supports the result reached by the Court. The Court relies on the fact that the terms "nonforfeitable" and "vested" were often used interchangeably in the legislative materials. This usage is said to be significant, because in the pension field a benefit is usually said to "vest" when a pension plan participant has fulfilled all the specified conditions for eligibility, such as age and length of service. The existence of other kinds of conditions, such as the sufficiency of the plan's assets, would not affect the determination of whether or not a benefit had "vested" in this traditional sense of the word.

But many of the statements in the legislative history relied upon by the Court were made in connection with proposed bills that were not enacted and whose express terms would have insured benefits "vested" in the traditional sense of the word. See n. 13, *supra*. These statements have no bearing on the present case, which concerns the construction of entirely different statutory language. Many of the other statements in the legislative history noted by the Court were made with respect to the bill that originally passed the House of Representatives, quite a different document from the bill that later emerged from the Conference Committee and was enacted into law as ERISA. The House bill provided that the insurance provision would cover only retirement benefits that were "nonforfeitable" by reason of the bill's minimum vesting standards. H. R. 2, as passed by the House, 93d Cong., 2d Sess., §§ 203, 409 (b)(1) (1974), 3 Leg. Hist. 3973–3979, 4024. See 2 *id.*, at 3293, 3347–3348 (explanation by Chairman of House Committee on Education and Labor). Under the legislation so proposed, there never would have been a time when the insurance scheme was in effect and a substantial portion of every plan's "vested" benefits were not also "nonforfeitable."

It was the Conference Committee that created the time gap

involved in this case (September 2, 1974, through December 31, 1975) during which pension plans were subject to the Act's insurance program but not to its minimum vesting standards. See H. R. Conf. Rep. No. 93–1280, pp. 48, 245 (1974), 3 Leg. Hist. 4323, 4515. In discussing the Conference Committee bill, certain Members of Congress also equated "vested" rights with "nonforfeitable" rights.[15] But there is no reason to suppose that these statements did not refer to the post-1975 operation of ERISA, when many benefits, "vested" in the traditional sense, also became "nonforfeitable" by reason of the Act's minimum vesting standards.[16]

Finally, contrary to the Court's assertion, the construction that I would give to the Act would not render meaningless the decision of Congress to make Title IV fully applicable as of September 2, 1974. That Title insured the following types of benefits provided by plans terminated between September 2, 1974, and December 31, 1975: (1) All benefits made ex-

---

[15] See, e. g., 3 Leg. Hist. 4734, 4735, 4741 (Sen. Williams); id., at 4752, 4758 (Sen. Javits); id., at 4800 (Sen. Nelson); id., at 4678 (Rep. Ullman); id., at 4694 (Rep. Brademas); id., at 4702 (Rep. Tiernan).

[16] The Court's theory that the term "nonforfeitable" as used in ERISA means no more than "vested" in the traditional sense must fail on an additional account. According to the definition of "vested" cited by the Court, "the Benefit under a pension plan that is described as vested, is, in the usual case . . . contingent . . . upon survival . . . of the individual involved to the earliest date at which he can validly claim a pension. Thus, the right can be terminated by death. After retirement, each monthly payment is contingent upon survival of the individual. . . ." D. McGill, Preservation of Pension Benefit Rights 6 (1972). Under the Court's theory, therefore, a benefit that is contingent on survival is by definition "nonforfeitable." But were this the case, 29 U. S. C. § 1053 (a)(3)(A) would be wholly superfluous. That section provides that "[a] right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that it is not payable if the participant dies (except in the case of a survivor annuity which is payable as provided in section 1055 of this title)." The fact that Congress felt it necessary to include this provision in the Act must be given weight in determining the proper meaning of "nonforfeitable."

pressly "nonforfeitable" by the terms of plans in existence on January 1, 1974; [17] and (2) at least 20% of the benefits required by the Act's "minimum vesting standards" to be "nonforfeitable" under the terms of plans created after January 1, 1974.[18]

For all the reasons discussed, I respectfully dissent.

MR. JUSTICE POWELL, dissenting.

I join MR. JUSTICE STEWART's dissenting opinion and add only a brief word. The difference between the majority and dissenting opinions in this case turns almost entirely upon the construction of language in petitioner's pension plan. This plan is an agreement negotiated in good faith by the petitioner and the union representing employees covered by the plan. Everyone concedes that the plan is a valid contract enforceable according to its terms, except to the extent that ERISA provides otherwise. The petitioner lawfully terminated the plan on December 31, 1975.

It is perfectly clear, at least to me, that the plain language of the plan conditioned the employees' benefits in the event of termination upon the adequacy of the assets then remain-

---

[17] For instance, had the Nachman plan simply not contained the provisions in Art. V, § 3, and Art. X, § 3, discussed above, it would have promised its participants a defined monthly benefit that was "nonforfeitable." The petitioner would then have been liable to the PBGC for whatever portion of those benefits were "guaranteed" by the PBGC pursuant to 29 U. S. C. § 1322 and exceeded the value of the plan's assets on termination. This liability would have been unaffected by the fact that a clause in the plan absolved the petitioner of any personal obligation to the plan's participants or to the plan's trustee.

[18] Title 29 U. S. C. § 1061 (a) provides that the "minimum vesting standards" of Title I of ERISA are applicable beginning September 2, 1974, to pension plans set up after January 1, 1974. Title 29 U. S. C. § 1322 (b)(8) states that "nonforfeitable" benefits provided by a plan that has been in effect for less than five years are "guaranteed" to the extent of 20% or $20 per month (whichever is greater) for each year of plan existence.

ing in the fund. If ERISA had not been enacted, the respondent Pension Benefit Guaranty Corporation acknowledges, the employees' benefits would have been limited by this condition. The respondent contends, however, that ERISA—and the respondent's own regulatory definition of "nonforfeitable"—require a construction of the plan that neither the petitioner nor its employees intended. I assume for present purposes that Congress could mandate this result. But in the absence of a clear expression of congressional intent, I would not conclude that Congress meant to alter contractual arrangements between private parties. For the reasons stated in the dissenting opinion, I find no such intent relevant to this case in either the ambiguous language of ERISA or its legislative history.

I add only that the decision today has little consequence beyond the resolution of this case. As I read the opinions, the decision affects only pension plans terminated on or before December 31, 1975, that contained language substantially identical to the language in petitioner's plan.