**Kenneth R. TUCKER, Plaintiff,**

**v.**

**GENERAL MOTORS RETIREMENT PROGRAM, and General Motors Corporation, in its capacity as administrator, Defendants.**

Civil Action No. 95–10689–MLW.

United States District Court,
D. Massachusetts.

Dec. 18, 1996.

Paul F. Kelly, Segal, Roitman & Coleman, Boston, MA, for Plaintiff.

Arthur G. Telegen, Foley, Hoag & Eliot, Boston, MA, for Defendants.

***MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR JUDGMENT AND REQUEST FOR ORAL ARGUMENT (# 18) AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT[1] (# 19)***

COLLINGS, United States Magistrate Judge.

### I. Introduction

The instant dispute arises out of a decision by the defendants, General Motors Retirement Program (the "Program") and General Motors Corporation ("GM"), to suspend the payment of basic pension benefits to the plaintiff, Kenneth R. Tucker ("Tucker"), in order to recoup a prior overpayment of early retirement benefits and a penalty consequent to the overpayment. Tucker alleges that the defendants have in various respects violated the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The parties have stipulated to the material facts of the case, and, following the submission of memoranda of law and oral argument on the merits, the claims are in a posture for decision.[2]

### II. The Facts

On August 1, 1980, at the age of 54, Tucker retired from his position as a salaried employee at GM in Framingham, Massachusetts, where he had worked for over 31 years. (Parties' Stipulation Of Material Facts # 14, I ¶ 1) Approximately thirty years earlier in 1950, GM had established the Program, officially denominated the General Motors Retirement Program for Salaried Employees in the United States, an employee pension plan within the meaning of ERISA. (# 14, I ¶¶ 2, 4) GM is the administrator of the Program which provides retirement and pension benefits to nearly 400,000 former GM employees. (# 14, I ¶¶ 2, 3)

Pursuant to the pertinent provisions of the Program, salaried GM employees with the requisite number of years of service who retire prior to the age of 62 are eligible to receive both a basic retirement benefit payment and a social security supplement, so-called an early retirement supplement, which is paid on a monthly basis until the retiree reaches the age of 62. (# 14, I ¶ 5) With respect to this early retirement benefit, the Program provides

> that if an employe entitled to receive a supplement has earnings after retirement in excess of the following annual earnings limitation in any calendar year before he attains age 62 ... a penalty equal to double the amount by which such earnings

---

1. Although entitled a motion for summary judgment, the plaintiff's submission, like that of the defendants, is actually a motion for judgment based upon the undisputed, stipulated record facts.

2. With the parties' consent, this case has been referred to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

exceed the amount permitted shall be charged against each succeeding monthly supplement which he would otherwise be entitled to receive until the full amount of such penalty is satisfied, it being understood that penalties and charges herein shall be cumulative if appropriate ... An employe receiving a supplement prior to age 62 ... may be required to certify whether his earnings have been in excess of the permitted amount and to furnish verification of the amount of his earnings. Unless repaid by the employe in a lump sum, any overpayments of a supplement made after an employe incurred a penalty because of excess earnings in accordance with the preceding paragraph shall be deducted from future monthly benefits payable to him under this Part A and under the supplementary benefit provisions of Part B.

Parties' Stipulation of Material Facts # 14, I ¶¶ 6, 7 and Exh. A at pp. 13–14.

In accordance with the terms of the Program, the referenced Part A retirement benefits are non-contributory, and include both basic pension benefits and supplemental retirement benefits. (# 14, I ¶ 7 and Exh. B at pp. 3–4)

At the time of his retirement, Tucker met with a representative of the Program to determine the amount of retirement benefits he was to receive. (# 14, I ¶ 8) His total retirement benefit was calculated to be $825.00 per month, of which $306.48 represented his basic retirement benefit with the remainder, $518.52, as a monthly early retirement supplement. (*Id.*) As required by the terms of the Program, Tucker agreed to restrict his earnings in each calendar year prior to his attaining age 65. (# 14, I ¶ 9) Specifically, the plaintiff signed Form SRP–117K entitled General Motors Retirement Program For Salaried Employees Supplement Calculation, which provided:

I hereby agree to restrict my participation in the work force, prior to age 65, following my retirement. If my earnings ... in any calendar year exceed $3,480 in 1980, $5,000 in 1981 or $5,500 in 1982, I understand that a penalty equal to double the amount by which such earnings exceed the amount

permitted shall be charged against each succeeding monthly supplement. I understand that the penalties and charges shall be cumulative, as applicable. The penalty shall continue until the full amount of such penalty is satisfied. At any time, provided I am then eligible, any supplement will then be reinstated. Any overpayment of any supplement made after such a penalty occurred because of excess earnings must be refunded by me in a lump sum or it will be deducted from the monthly benefits otherwise payable to me under the Program. In connection herewith, I hereby authorize the Social Security Administration to release to [GM], on a continuing annual basis, the total earnings reported for me for each year to be specified by [GM].

Parties' Stipulation Of Material Facts # 14, I ¶ 9 and Exh. C.

When Tucker executed Form SRP–117K in 1980, the earnings limitations for 1983 and 1984 had yet to be determined. (# 14, I ¶ 10) They were later set by the Program at $6,000 and $6,500 respectively. (# 14, I ¶ 11)

The Program was informed in October, 1980, that as a result of changes wrought by the Tax Reform Act of 1976, the Social Security Administration ("SSA") would not continue to provide information respecting earnings information directly to the Program per the agreement then in place between the plan administrator and the SSA. (# 14, I ¶ 12) Thereafter, from 1980 through 1987, the Program did not receive Tucker's annual earnings information either from SSA or from the plaintiff himself. (# 14, I ¶ 13)

Beginning in 1987, the Program sent mailings to almost 80,000 GM retirees who were participants in the Program, including Tucker, requesting that earnings information authorizations be executed in accordance with SSA's new procedure. (# 14, I ¶ 15 and Exh. E) The letter, when signed, authorized GM to receive earnings information from SSA both retrospectively and prospectively so long as the participant was receiving supplemental benefits. (# 14, Exh. E) In addition, the letter further provided for the suspension of supplemental benefits should the participant fail either to authorize release of the

information or to provide it on his or her own behalf. (*Id.*) Tucker received this letter but never responded to it. (# 14, I ¶¶ 15, 16)

Tucker's early retirement supplemental payments ended in due course in September, 1987, the month prior to his sixty-second birthday. (# 14, I ¶ 14) Since that time, the plaintiff has received only the basic retirement benefit from the Program. (*Id.*)

It is asserted that about three years later the Program again attempted to obtain earnings information authorizations from retirees who failed to respond to the 1987 request. (# 14, I ¶ 17) In 1990, the Program sent out a second letter with a so-called "disclosure agreement" which was similar in all respects to the 1987 correspondence. (# 14, Exh. F) Although it is unclear whether Tucker received this letter, it is undisputed that he sent no response to the Program at that time. (# 14, I ¶ 17)

Finally, by letter dated August 20, 1993, the Program again sought earnings information from Tucker. (# 14, Exh. G) The plaintiff was asked to obtain earnings verification directly from SSA for all years following his retirement and to submit that data to the Program before November 1, 1993. (*Id.*) Once this information was reviewed, Tucker would be provided with an explanation of any adjustments to be made prior to an attempt by the Program to recover overpayments. (*Id.*) The letter concluded by noting that failure to provide the requested information would result in suspension of benefits pending further investigation. (*Id.*)

When Tucker failed to respond to this last request from the Program by November 1, 1993, his basic pension benefits were suspended on December 1, 1993. (# 14, I ¶ 19)

The plaintiff eventually sent his post-retirement earnings information to the Program by letter dated March 28, 1994. (# 14, I ¶ 20 and Exh. H) The SSA record submitted by Tucker showed that he had earned $13,699.35 in 1983 and $13,531.48 in 1984. (# 14, I ¶ 20) His 1983 earnings exceeded that year's earnings limitation of $6,000 by $7,699.35 and, similarly, his 1984 earnings exceeded that year's limitation of $6,600 by $6,931.48. (*Id.*)

By letter dated April 29, 1994, the Program, via the administrator, advised Tucker that a determination had been made that he had exceeded the earnings limitations in 1983 and 1984 and, as a result, he was being assessed a penalty of $29,261.66, a sum representing twice the amount of his earnings in excess of the two annual limitations. (# 14, I ¶ 21 and Exh. I) After noting that the plaintiff's retirement benefits had been in suspense since December, 1993, the letter then stated that Tucker's basic monthly pension benefits would continue to be suspended until the entire overpayment was recovered unless Tucker chose instead to repay in a lump sum. (# 14, I ¶ 21 and Exh. I) The plaintiff has not opted to repay the overpayment in a lump sum, and, consequently, his basic monthly pension benefits will remain suspended until June, 1997, at which point the penalty will have been recouped by the Program. (# 14, I ¶ 20)

Earlier in April, 1994, Tucker had sent a letter to the Pension Administration Center at GM requesting a copy of all pension plans and related documents as well as amendments in effect in May, 1980, including all agreements between GM and Tucker and all correspondence sent to GM relative to Tucker's pension benefits. (# 14, II ¶ 1 and Exh. K) The GM Pension Administration Center responded by letter dated May 18, 1994, stating "[t]he documents you requested is (are) enclosed." (# 14, II ¶ 2 and Exh. L) Provided to Tucker were pages 3–9 of the 1980 Summary Plan Description ("SPD") which generally describe the plan's provisions for basic and supplemental benefits together with copies of Tucker's retirement authorization forms. (*Id.*) The documents sent did not contain any information with respect to the procedures for appealing the penalty determination. (# 14, Exh. L)

Tucker, by his attorney, sent a letter to the GM Pension Administration Center on June 7, 1994, seeking reconsideration of the plan administrator's decision. (# 14, I ¶ 23) This letter reiterated Tucker's request for all plan documents "including those required by ERISA" and noted that the plaintiff had yet to receive information regarding his appeal rights. (# 14, II ¶ 3 and Exh. M) Tucker

received a letter in response dated September 22, 1994 from Lucy McDermott, a post-retirement manager at the GM Pension Administration Center, in which she stated that she had enclosed "a copy of the current benefits book" which included information on the appeals process. (# 14, I ¶ 23 and Exh. N) This letter also contained various excerpts from the GM Salaried Retirement Program in effect from 1971 to 1994, including sections related to early retirement supplements and earnings limitations. (# 14, II ¶ 4 and Exh. N) Although the stipulated facts do not state whether the plaintiff actually received the benefits book, it appears that he did for on October 4, 1994, Tucker's attorney wrote to the Program's Employee Benefits Plan Committee ("EBPC") appealing the suspension of Tucker's basic monthly retirement. (# 14, I ¶ 24)

The EBPC denied Tucker's appeal in March, 1995. (# 14, I ¶ 25 and Exh. J) Concluding that the determination by the plan administrator and the resulting suspension were proper, the EBPC ended its letter by noting that Tucker would be eligible for restoration of his monthly benefits in July, 1997, at which time the overpayment will have been recovered. (*Id.*)

Finally, with respect to Tucker's requests for plan documents, on June 2, 1995, GM's attorney sent a complete copy of the GM Retirement Program for Salaried Employees, as amended effective October, 1990, to the plaintiff's attorney. (# 14, II ¶ 5 and Exh. O)

### III. Discussion

In his complaint, the plaintiff alleges ten[3] separate counts for violation of ERISA, to wit: failure to provide information (Count One); failure to provide adequate notice (Count Two); improper penalty (Count Three); improper suspension of benefits (Count Four); excessive penalty (Count Five); violation of plan (Count Six); violation of fiduciary duties (Count Seven); equitable

estoppel (Count Seven [sic]); laches (Count Eight [sic]); and claims procedure (Count Nine [sic]). Currently at issue are the so-called "set-off" claim and the "information" claim. The parties have agreed that these claims are to be decided by the Court on the basis of a written record, a procedure preferable in the circumstances of this case to cross-motions for summary judgment. The First Circuit has observed that

[t]he sometimes unrecognized difference between these two procedures is important; to stipulate a record for decision allows the judge to decide any significant issues of material fact that he discovers; to file cross-motions for summary judgment does not allow him to do so.

*The Boston Five Cents Savings Bank v. Secretary of Department of Housing and Urban Development,* 768 F.2d 5, 11–12 (1 Cir., 1985); *see also Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 n. 7 (1 Cir., 1992).

As earlier noted, the parties have indeed stipulated to the relevant material facts involved in these two claims as reflected in the factual recitation, and a ruling on the merits shall be based upon this record.

### A. The Set-off Claim [4]

The plaintiff argues that the defendants, the Program and the plan administrator, have violated the strict nonforfeitability provision of ERISA, 29 U.S.C. § 1053, by suspending his basic monthly benefit after he attained normal retirement age. Tucker's claim is quite discrete, as he himself explains:

Plaintiff does not challenge the Program's right to assess a penalty for earnings prior to age 65 or to collect such a penalty by suspending monthly supplements. Nor does the plaintiff contest the Program's right to suspend monthly benefits (whether supplemental or basic benefits) *before* age 65. Plaintiff only challenges the Program's right to suspend basic monthly ben-

---

**3.** Although the complaint actually lists nine counts, in fact, there are two count sevens, resulting in a total of ten claims.

**4.** The parties variously use the term set-off and off-set to describe the suspension and recoup-

ment at issue here. For ease of analysis and because the term "set-off" appears to have a more technical meaning under ERISA, the Court will attempt to avoid using these terms except when discussing each parties' argument.

efits *after* a participant has reached normal retirement age.

Memorandum of Law # 20 at 2 n. 1 (emphasis in original). To explain more fully, Tucker admits that § 1053 does not apply to benefits received prior to normal retirement age [5] and, therefore, that the Program may properly have imposed such a suspension prior to the time that he reached age 65 [6]. He nonetheless contends that § 1053 clearly prohibits the defendants from taking such action now that he is over normal retirement age. Tucker further points out that § 1053 provides only two specific exceptions, neither of which is applicable here, and that the presumption is that these exceptions should be narrowly construed. Lastly the plaintiff notes, apparently as a matter of policy, that there are other judicially-recognized means by which to recoup the overpayments which the Program failed to utilize, *e.g.*, inter alia, a separate claim for restitution.

The defendants argue that § 1053 is inapplicable in that the Program's actions do not amount to a suspension as prohibited by that section but rather constitute a "set-off" or redirection of Tucker's payments back to the Program. In other words, while the payment of benefits to Tucker has been suspended, the benefits due and owing to the plaintiff have continued to accrue, but are being withheld and applied against a debt owed to the Program. It is argued that under another provision of ERISA, namely 29 U.S.C. § 1056, a set-off of benefits to recover overpayments has been recognized as a proper exception to the general rule of protecting a participant's benefits and that the Program's actions fall squarely within this exception.

A number of policy reasons are suggested by the defendants as supporting their actions. First, the Program and the plan administrator assert that failure to allow a set-off would effectively provide a windfall to Tucker. Second, it is argued that allowing a

set-off in situations such as this is consonant with the overarching goals of ERISA, to wit, the protection of benefits for all plan participants, and guarding against excess administrative burden in order to encourage the voluntary administration of pension plans by employers. Thus, the defendants contend, the ability to set-off serves as an efficient and inexpensive means by which to recover and protect plan assets.

To summarize, the issue presented is whether a pension plan within the meaning of ERISA may withhold the basic monthly retirement benefits of one who has reached normal retirement age in order to recover an overpayment of supplemental benefits paid to that person prior to his having attained normal retirement age.

In relevant part, ERISA mandates:

Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon attainment of normal retirement age, and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

(1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

(2) A plan satisfies the requirements of this paragraph if it satisfies the [vesting] requirements of subparagraph (A), (B), or (C) [relating to employer derived contributions.]

29 U.S.C. § 1053(a)(1)–(2).

Normal retirement benefits are those "under the plan commencing at normal retirement age." 29 U.S.C. § 1002(22). As previously noted, normal retirement age is the earlier of the age provided by the plan or the time when the participant reaches age 65. 29 U.S.C. § 1002(24). Nonforfeitable is defined as:

---

**5.** As defined in ERISA,

The term "normal retirement age" means the earlier of—
(A) the time a plan participant attains normal retirement age under the plan, or
(B) the later of—
(i) the time a plan participant attains age 65, or

(ii) the 5th anniversary of the time a plan participant commenced participation in the plan.

29 U.S.C. § 1002(24).

**6.** Whether the normal retirement age would be 62 or 65 years of age need not be decided given that Tucker was 68 years old when his basic monthly retirement benefit was suspended.

a claim obtained by a participant ... to that part of an immediate or deferred benefit ... which arises out of the participant's service, which is unconditional, and which is legally enforceable against the plan.

29 U.S.C. § 1002(19).

The legislative history of the nonforfeitability provision states that "an employee's rights, once vested, are not to be forfeitable for any reason. An employee's right to benefits attributable to his own contributions may never be forfeited."[7] House Conf. Report 93–1280 *reprinted in* 1974 U.S.C.C.A.N. 4639, 5052.

In addition to this strict prohibition on forfeiture, ERISA also forbids alienation or assignment of benefits under pension plans. Section 1056 states that "each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). There are, however, a number of exceptions to this rule. For example, the terms "assignment" and "alienation" do not include "[a]ny arrangement for the recovery by the plan of overpayments of benefits previously made to a participant." 26 C.F.R. § 1.401(a)–13(c)(2)(iii).

The case law is clear that § 1053 does not protect any interest in early or supplemental retirement benefits. *See, e.g., Rossi v. Boston Gas Co.,* 1994 WL 548101 (D.Mass.) (finding § 1053 inapplicable to withholding of part of monthly benefit because participant had not reached retirement age) (citing *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1041 (2 Cir., 1985)); *Geib v. New York State Teamsters Conference Pension & Retirement Fund,* 758 F.2d 973, 977 (3 Cir., 1985); *Johnson v. Franco,* 727 F.2d 442, 444–46 (5 Cir., 1984); *Fine v. Semet,* 699 F.2d 1091, 1093 (11 Cir., 1983); *Hurn v. Retirement Trust Fund,* 648 F.2d 1252, 1253–54 (9 Cir., 1981). Therefore, had the defendants been able sooner to determine that Tucker had been overpaid and to initiate withholding before 1987, then presumably the overpayment could have been recouped prior to Tucker reaching the apparent protected status of normal retirement age.

The next question is whether § 1053 applies in the present case. In analytical terms, the threshold issue is whether the instant withholding amounts to a forfeiture as defined in § 1002(19) and as prohibited by § 1053.

The United States Supreme Court has recognized, in construing § 1002(19), that a forfeiture "normally connotes a total loss in consequence of some event rather than a limit on the value of a person's rights." *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 372, 100 S.Ct. 1723, 1731–32, 64 L.Ed.2d 354 (1980) (finding that upon pension plan termination participant has only a nonforfeitable claim for a pension which may be limited when plan assets are insufficient to cover all pension obligations). From this, the Supreme Court concluded that "nonforfeitable" describes "the quality of the participant's right to a pension rather than a limit on the amount he may collect." *Id.* at 373, 100 S.Ct. at 1732. Thus, it is "the claim to benefits rather than the benefit itself" which is nonforfeitable. *Nachman,* 446 U.S. at 371, 100 S.Ct. at 1731.

The Supreme Court reiterated this view when it stated that "'nonforfeitability' assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or method for calculating the benefit." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981) (finding that plan may offset retirement benefits in an amount equal to worker's compensation payments received despite lack of explicit statutory authorization). In *Alessi,* the Supreme Court made clear that the level or amount of benefit to be received is governed by the agreement of the parties through the provisions of the plan. *Id.* at 511, 101 S.Ct. at 1900.

In light of *Nachman* and *Alessi,* it follows that the defendants' actions do not amount to a forfeiture as contemplated and prohibited by § 1053. Tucker does not allege, nor does the record reveal, that the plaintiff has lost

7. As noted above, certain narrow forfeitures of benefits derived from employer contributions are allowed. These exceptions however are not applicable here.

any right to receive his retirement benefits. *Compare Nash v. Trustees of Boston University*, 946 F.2d 960 (1 Cir., 1991) (applicability of § 1053 to rescission of early retirement agreement due to fraud). Indeed, the defendants readily acknowledge that Tucker's basic monthly benefits will be reinstated upon the recoupment of the overpayment. In addition, the temporary nature of the suspension of payment **to Tucker** does not rise to the level of a "total loss of consequence" as limned by the Supreme Court in *Nachman.* The actions taken by the Program and the administrator have merely limited the amount of benefit to be received; "the amount of setoff is merely a function of the amount to be recouped and the length of time necessary to recoup." *Vintilla v. U.S. Steel C.P. For Employee P.B.*, 606 F.Supp. 640, 643 (W.D.Pa., 1985), *aff'd*, 782 F.2d 1026 (3 Cir.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986). That the set-off amounts to a withholding of the entire benefit does not convert the withholding into a forfeiture of Tucker's claim to a retirement benefit. *Id.*

Moreover, this limit is not arbitrary. To the contrary, provision was made for it in the plan documents signed by Tucker, *e.g.*, Form SRP–117K. The Court finds, as did the Supreme Court in *Alessi*, that Tucker and the defendants have, by agreement under the plan, provided for limitations on benefits which do not violate ERISA. The plaintiff was on notice that there were limits to the early retirement supplemental benefits, as he was also aware that failure to comply with the delineated earnings limitations and notice requirements would obligate him to repay the excess monies received. The plan documents also made clear that the overpayments could be recouped through suspension of benefits should Tucker determine not to repay the amount owing in a lump sum.

Since the defendants' actions do not result in a forfeiture and thus are not covered by § 1053, Tucker's argument that the defendants' actions should not be construed to be an exception to § 1053 need not be discussed. Nonetheless, it is appropriate to recognize that the Program and plan administrator's actions are consistent with the statutory scheme and legislative history of ERISA. As the Supreme Court has noted, the explicitly enumerated exceptions are not exclusive, *Nachman,* 446 U.S. at 372–73, 100 S.Ct. at 1731–32, and that other losses of benefits which are consistent with ERISA may be allowed. *Alessi,* 451 U.S. at 514–21, 101 S.Ct. at 1901–05. Moreover, the Supreme Court concluded, when addressing a participant's argument that the reduction in benefits at issue was not proper because it was not specifically excepted from § 1053, that arguments attacking limitations on the amount of a benefit received by reference to § 1053 prohibitions and exceptions are precluded since "the level of pension benefits are not prescribed by ERISA." *Id.* at 518, 101 S.Ct. at 1903–04. From all this, it must be concluded that a temporary withholding of retirement benefits in order to recoup a benefit overpayment is not a forfeiture and is therefore not prohibited by § 1053.

In light of the strong congressional intent to protect participants' retirement benefits, it is worth analyzing the propriety of the defendants' actions under § 1056. As noted above, arrangements by which a pension plan may recoup benefits previously overpaid to the participant are not included within the purview of the anti-alienation provision. However, the regulations related to § 1056 generally define the scope of permissible arrangements for the recovery of such payments.

An alienation or assignment is defined as follows in the pertinent Department of Treasury regulation:

[a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit which is, or may become, payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)–13(c)(1).

According to the regulations:

(c)(2) *Specific arrangements not considered an assignment or alienation.* The terms "assignment" and "alienation" do not include ...

(iii) Any arrangements for the recovery by the plan of overpayment of benefits previously made to a participant.

26 C.F.R. § 1.401(a)–13(c)(2)(iii).

One court has interpreted the pertinent regulations as follows:

> The controlling "anti-alienation" regulations issued by the Internal Revenue Service and relied on by *Guidry [v. Sheet Metal Workers Nat. Pension Fund]*, 493 U.S. [365] at 372 n. 10, 110 S.Ct. [680] at 685 n. 10 [107 L.Ed.2d 782] (quoting 26 C.F.R. § 1.401(a)–13(b)(1) (1989)), further clarify the distinction between a set-off of benefits by the plan and a garnishment of benefits by an outsider. The regulations define alienation or garnishment as "[a]ny arrangement providing for the payment to the *employer* of plan benefits which otherwise would be due to the participant under the plan," or "whereby *a party* acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, … a plan benefit payment." *See* 26 C.F.R. § 1.401(a)–13(c)(1) (1992) (emphasis added.) Furthermore, they specifically exclude from ERISA's anti-alienation bar actions by the pension plan itself to apply or set off vested pension benefits to recover debts owed by the participant to the plan as a result of a prior overpayment of benefits or as a result of the failure by a participant to repay a debt to the plan. *See* 26 C.F.R. §§ 1.401(a)–13(c)(2)(iii) and (d)(2) (1992). Hence, the regulations clearly comprehend "garnishment" or "alienation" as referring to actions by third parties, such as a beneficiary's employer or creditors, and not as a recoupment by the pension plan.

*Coar v. Kazimir*, 990 F.2d 1413, 1421–22 (3 Cir.), *cert. denied*, 510 U.S. 862, 114 S.Ct. 179, 126 L.Ed.2d 138 (1993).

There can be no doubt but that the regulations and the reasoning of the Third Circuit are clearly applicable to the factual scenario at hand. The Court finds that set-offs of retirement benefits in order to recoup benefits overpayments by the Program are allowable under ERISA. Moreover, so interpreting this exception to the anti-alienation provision furthers the goals of decreasing administrative burdens upon pension plans as well as guarding the plan assets for all plan participants. Whether instituting litigation in order to recoup the overpayment was an option for the Program and plan administrator, it was not a route that the defendants were required to take.

### B. The Document Disclosure Claim

██ Tucker claims that GM, by failing properly to respond to his requests for plan documents, has violated the provisions of 29 U.S.C. § 1024(b)(4) and, as a consequence, is liable to him for a penalty as provided for under 29 U.S.C. § 1132(c)(1). He contends that the delay in providing relevant documentation resulted in prolonging the financial hardship caused by the suspension of his benefits.

GM argues that it did not violate its statutory obligation to the plaintiff. In its memorandum, while conceding that it did not send to Tucker "any and all" documents as requested, GM asserts that Tucker's initial request was extremely broad and that, in order to save time and money, GM responded to the request with only those documents GM deemed relevant to him. The plan administrator further asserts that any insufficiencies in its response were able to be resolved by further communication with Tucker's attorney and that the plaintiff was eventually able to perfect his appeal of the plan administrator's decision. Thus, if it were to be determined that a technical violation had occurred, Tucker has not shown that any prejudice ensued and, therefore, no penalty is appropriate.

> Title 29 U.S.C. § 1024(b)(4) provides:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies.

*Id.*

ERISA further provides that:

Any administrator who fails or refuses to comply with a request for any information which such administrator is required . . . to furnish . . . within 30 days after such request may in the court's discretion be personally liable to such participant . . . in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c).

Where a violation of § 1024 has been established and a decision must be made whether to impose a penalty, consideration should be given, among other factors, to whether the participant has been prejudiced by the plan's actions or whether the plan's actions evidence bad faith conduct. *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 588 (1 Cir., 1993). However, a finding of bad faith and prejudice are not prerequisites to the imposition of any penalty. *Id.*

As noted above, although forwarded within the mandated 30 days, GM concedes that its original response was not entirely responsive to Tucker's initial request. By the same token, that initial request for documents was all-encompassing. The record reveals that upon the plaintiff's second request via his attorney in June, 1994, GM apparently forwarded additional documents in September, 1994, which included information regarding the appeal procedures. With the documentation provided at this juncture, Tucker was able, and in fact did, prosecute his appeal of the decision to suspend his basic monthly retirement benefits to the EBPC. In June of 1995, the plaintiff's attorney received a complete copy of the GM Retirement Program for Salaried Employees from the defendant's attorney.

In order to have avoided violation of § 1024, it was incumbent upon GM to have sent "any and all" plan documents on or about the end of May, 1994, to Tucker as he had requested in writing. Having failed to respond fully to the plaintiff's request, GM breached its duty under ERISA to disclose requested documents. Thus, it appears that GM violated § 1024.

A violation of § 1024 does not however require the imposition of a penalty. *See*

*Rodriguez–Abreu,* 986 F.2d at 588–89. Given the broad discretion afforded under § 1132, courts have reached varying conclusions on the extent of penalties to be awarded. Some courts, for example, have imposed penalties at less than the statutory maximum merely for neglect or indifference on the part of the plan, *Daniel. v. Eaton Corp.,* 839 F.2d 263, 268 (6 Cir., 1988), whereas other courts have imposed no penalty where there has been no showing of bad faith or prejudice. *Rodriguez–Abreu,* 986 F.2d at 588–89.

The record as presented does not reveal any evidence of bad faith on the part of GM or substantial prejudice to Tucker. The plan administrator did in fact respond to the plaintiff's request, albeit not fully, within 30 days as required by the statute. Moreover, GM's response letter included an "800" telephone number for Tucker to call if he had any further questions. The failure to provide all the documentation requested by Tucker does not appear to have been motivated by malice or even neglect, but rather by the magnitude of the potential undertaking. In responding, GM seems to have sent those documents the plan administrator believed to be most pertinent. The manner in which GM responded did leave Tucker without the information necessary to file an immediate appeal thereby causing a delay which allegedly prolonged the financial hardship caused by the withholding of his benefits. That delay was ultimately of no consequence, however, since Tucker's administrative appeal to the EBPC was unsuccessful.

Having carefully considered all of the facts and circumstances involved, the Court finds, in its discretion, that this is not a situation where the imposition of a penalty is warranted. GM's actions do not evidence any bad faith, nor any intent to somehow undermine the plaintiff's rights. Tucker was not prejudiced by any delay in receiving information regarding the appeal procedure in that he was able to prosecute a timely administrative appeal, and, in any event, as a result of the EBPC decision, his basic monthly retirement benefits continued to be withheld. Any delay did not cause ongoing financial hardship to the plaintiff.

To conclude, the Court finds the imposition of a penalty in this case to be inappropriate, and Tucker's request pursuant to 29 U.S.C. § 1132(c)(1) shall be denied.

### IV. Conclusion And Order

For all the reasons stated hereinabove, it is ORDERED that the Plaintiff's Motion For Summary Judgment (# 19) be, and the same hereby is, DENIED. It is FURTHER ORDERED that Defendants' Motion For Judgment (# 18) be, and the same hereby is, ALLOWED to the extent that the Court rules that the defendants' actions were not in violation of either 29 U.S.C. § 1053 or 29 U.S.C. § 1056 and that no penalty shall be imposed for the claimed delays in providing requested documents and otherwise PRE-TERMITTED.

Plaintiff's counsel shall file and serve a status report *on or before the close of business on Tuesday, December 31, 1996* stating which, if any, of the claims contained in the Complaint are being pressed in view of the Court's rulings herein, and as to any claim or claims being pressed, whether that claim or those claims may be determined on the basis of the record currently before the Court, and if not, what further proceedings are necessary to resolve the instant litigation in its entirety.