*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0425P (6th Cir.)
File Name: 02a0425p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BENEFITS COMMITTEE OF
SAINT-GOBAIN
CORPORATION; GEORGE B.
AMOSS; BRUCE H. COWGILL;
STEPHEN A. SEGEBARTH;
DENNIS J. BAKER, in their
capacities as members of the
Benefits Committee of Saint-
Gobain Corporation,
       *Plaintiffs-Appellants,*

       *v.*

KEY TRUST COMPANY OF
OHIO, N.A., Trustee of the
Furon Company Employee
Stock Ownership Plan,
       *Defendant-Appellee.*

No. 01-3255

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00751—Patricia A. Gaughan, District Judge.

Argued: August 2, 2002

Decided and Filed: December 16, 2002

1

Before:  SILER, COLE, and CLAY, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**   Michael L. Banks, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, for Appellants. John W. Edwards II, JONES, DAY, REAVIS & POGUE, Menlo Park, California, for Appellee.   Peter B. Dolan, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Amicus Curiae.
**ON BRIEF:**  Michael L. Banks, Kay Kyungsun Yu, Brian J. Dougherty, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, for Appellants. John W. Edwards II, JONES, DAY, REAVIS & POGUE, Menlo Park, California, Patricia Eschbach-Hall, Jeffrey S. Leavitt, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, for Appellee. Peter B. Dolan, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

   SILER, Circuit Judge.   Plaintiff Benefits Committee of Saint-Gobain Corporation and Plaintiffs George B. Amoss, Bruce H. Cowgill, Stephen A. Segebarth, and Dennis J. Baker, in their capacities as members of the Benefits Committee of Saint-Gobain Corporation (collectively, the "Benefits Committee"), appeal the grant of summary judgment to Defendant Key Trust Company of Ohio, N.A. (the "Trustee"), which serves as the trustee of the Furon Company Employee Stock Ownership Plan (the "Furon ESOP"). The district court found that repayment by the Furon ESOP of a loan to Saint-Gobain Corporation ("Saint-Gobain"), the successor corporation to Furon, would violate the Trustee's fiduciary duties under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 832, as amended, 29 U.S.C. § 1001, *et seq.*  We reverse and remand.

## BACKGROUND

### I.    Facts and Procedural Posture

The parties stipulated below to the basic facts underlying this case, which the district court adopted.

The Benefits Committee is the plan administrator, as defined by ERISA, of the Furon ESOP.  Furon was the original plan sponsor of the Furon ESOP.  As described below, Saint-Gobain acquired Furon in late 1999.  Both the Benefits Committee and the Trustee are named fiduciaries of the Furon ESOP.

Furon established the Furon ESOP on February 4, 1990. The Furon ESOP was intended to qualify as a stock bonus plan under § 401(a) of the Internal Revenue Code of 1986 (the "Code"), as amended, and as an employee stock ownership plan as defined by § 4975(e)(7) of the Code.  The Furon ESOP was designed to invest primarily in shares of Furon stock.  Furon established the Furon ESOP to provide eligible employees with the opportunity to obtain a beneficial interest in the company through the allocation of Furon stock to individual participant accounts.

Furon and Ameritrust Company National Association entered into the Furon Company Employee Stock Ownership Plan Trust Agreement (the "Trust Agreement") on February 15, 1990.  The Trust Agreement provides for the establishment of the Furon Company Employee Stock Ownership Plan Trust (the "Trust") to hold the assets of the Furon ESOP, with Ameritrust as the trustee.  The Trustee is the successor to Ameritrust.

The Benefits Committee claims that under the Trust Agreement it has full discretion to construe and interpret the

terms of the Furon ESOP. The Trustee is the custodian of the Furon ESOP's assets and holds those assets under the Trust Agreement; it is responsible for making payments and distributions as provided in the Furon ESOP and the Trust Agreement at the direction of the Benefits Committee, to the extent permitted by law.

The Trustee caused the Trust to enter into a series of loan transactions with Furon, whereby Furon loaned money to the Furon ESOP to finance the purchase of Furon stock (the "Exempt Loans"). The Exempt Loans were permitted by the terms of the Furon ESOP. The Exempt Loans are subject to ERISA and the Code, which generally prohibit loans between employers and the employee benefit plans they sponsor. However, the Exempt Loans were structured to fall within the exemption set forth in ERISA, 29 U.S.C. § 1108(b)(3), and the Code, 26 U.S.C. § 4975. The Exempt Loans were made between October 1, 1990, and August 29, 1997, in the aggregate principal amount of $6,241,098.85.

The Exempt Loans were designed so that the Trust, acting through the Trustee, borrowed money from Furon. The Trustee then used the proceeds from the Exempt Loans to purchase Furon stock, which was placed in a Suspense Subfund (the "Subfund") rather than allocated to the account of any individual Furon ESOP participant. No security was pledged, rendering the Exempt Loans unsecured.

Furon made contributions to the Furon ESOP that the Trustee used to make principal and interest payments to Furon on the Exempt Loans. As the Exempt Loans were repaid, a portion of the Furon stock in the Subfund was released based upon a formula set forth in § 6.3 of the Furon ESOP. As the Furon stock was released, it was allocated to the individual accounts of the Furon ESOP participants pursuant to §§ 6.1 and 6.4 of the Furon ESOP. Thus, when the Furon ESOP was first established, individual participant accounts were empty because all of the Furon stock held by the Trust was in the Subfund. Over time, as earned, the Furon stock was

security interest in the subfund as collateral to secure the exempt loans. We say "simply," but no doubt this will add some increased expense and effort to the process. In essence, a new requirement for exempt loans will have been established by the DOL, without resort to the appropriate rule-making processes. In addition, ignored in the DOL and Trustee's arguments is that sometimes third parties make the exempt loans to leveraged ESOPs. Conceivably, those loans may not be secured, and those financial institutions will be subject to the same potential forfeiture as the Company in this case.

In sum, though the Trustee could technically "stiff" the employer for the loan under the Loan Agreement, it does not serve the law or policy surrounding ESOPs to permit the Trustee to use this ability to justify disregarding the ESOP Agreement and direction of the Benefits Committee in a technical application of the ERISA fiduciary standard.

## CONCLUSION

The district court erred in granting summary judgment for the Trustee. Therefore, we REVERSE and REMAND for entry of judgment in favor of the Benefits Committee.

Thus, the fiduciary concern is whether payment of the money owed to the Company would infringe on the participants' rights to that money if it cannot be paid. The Benefits Committee aptly restates this issue as "[p]ut another way, repayment of the Exempt Loans violates [ERISA fiduciary obligations] because it would violate [ERISA fiduciary obligations]." The remainder only arises as a result of ERISA's prohibiting repayment of the loan, and ERISA's asserted prohibition depends exclusively on the existence of the remainder. This circular logic hardly seems an adequate basis for this court to condone the disregard by the Trustee of the Furon ESOP agreement and the direction of the Benefits Committee to which he is supposed to answer. Our decision in *Jordan* supports this conclusion, as the repayment of money borrowed, just as payment of attorneys' fees expended, is not a "benefit" within the meaning of the statute.

The intent of the statute and these safeguards is not furthered by such a technical reading either. As discussed in *Spink*, the goals that employees will not be left empty-handed once employers have guaranteed them certain benefits or to make as certain as possible that pension fund assets will be adequate to meet expected benefits payments are not undermined at all by permitting the ESOP to repay the loan to the Company. The only way to describe the reneging on the loan payment would be a "windfall" to the participants. The purpose of these ERISA safeguards was not to obtain windfalls for the participants but ensure that the rights promised by a company were fulfilled. In this case, those rights – as well as a large surplus on top of that – have inured to the participants.

Were we to agree with the district court and find for the Trustee, the results would not be increased protection of ESOP beneficiaries. As the DOL and the Trustee candidly admit, had the Company taken a security interest in the Subfund as collateral for the exempt loan, then there would be no grounds for the refusal to pay the loan. So, every new ESOP and exempt loan to existing ESOPs will simply take a

transferred from the Subfund and allocated to individual participant accounts.

On October 23, 1999, approximately 95% of Furon's stock was acquired by FCY Acquisition Corporation ("FCY") in a cash tender offer. FCY is a wholly owned subsidiary of Saint-Gobain. The acquisition included the purchase for cash of all the Furon stock held by the Furon ESOP, including the unallocated stock held in the Subfund, at a price of $25.50 per share. The purchase price represented a premium of 56% over the market value of Furon stock, which was valued at $16.31 as of September 17, 1999. The cash proceeds from the sale of the Furon stock in the Subfund were approximately $6,001,042.00. As of October 22, 1999, the day before the acquisition, the Furon ESOP included 2,220 participants.

On November 21, 1999, the remaining outstanding shares of Furon stock were acquired indirectly by Saint-Gobain through a merger of FCY with Furon. As of that date, the Subfund was composed solely of cash proceeds from the sale of the Furon stock. On November 21, 1999, the principal amount of the Exempt Loans was $2,332,653.75.

On December 31, 1999, Saint-Gobain Performance Plastics Corp., a wholly owned subsidiary of Saint-Gobain, was merged with the acquired Furon. The new entity changed its name to Saint-Gobain Performance Plastics Corporation ("Saint-Gobain Plastics"). Thus, the current sponsor of the Furon ESOP and the "Company" referred to in the Furon ESOP is Saint-Gobain Plastics.

On March 10, 2000, the board of directors of Saint-Gobain Plastics amended and terminated the Furon ESOP, effective March 17, 2000. On March 14, 2000, the Benefits Committee notified the Trustee by letter of the Furon ESOP amendment and termination.

On May 22, 2000, Saint-Gobain requested a determination from the Internal Revenue Service ("IRS") that termination of the Furon ESOP and repayment of the Exempt Loans would

not violate the Code. On September 1, 2000, the IRS issued a favorable determination that the amendment and termination of the Furon ESOP did not adversely affect the ESOP's status.

The Benefits Committee instructed the Trustee to use the cash proceeds from the sale of the Furon stock in the Subfund to pay the balance of the Exempt Loans (now payable to Saint-Gobain Plastics). The Trustee refused. Nevertheless, on March 17, 2000, at the Benefits Committee's direction, the Trustee allocated the assets in the Subfund, less the amount owing on the Exempt Loans, to individual participant accounts. In early June 2000, Furon ESOP participants were notified of the amount of their individual account balances and informed of the various distribution options available to them. Later that month, the Trustee began processing requests from Furon ESOP participants for distribution.

Neither Saint-Gobain nor Saint-Gobain Plastics has made any contributions to the Furon ESOP since Furon was acquired by Saint-Gobain. Likewise, the Trustee has made no payments on the Exempt Loans since that time. Thus, the amount in controversy is $2,332,653.75, the principal amount owing on the Exempt Loans as of November 21, 1999, and remaining money in the Subfund.

The Benefits Committee filed suit in 2000. The complaint set forth two causes of action. Count One alleged that the Trustee's failure to repay the Exempt Loans with the cash proceeds from the sale of the Furon stock in the Subfund constituted a breach of the terms of the Furon ESOP. Count Two alleged that the Trustee's failure to repay the Exempt Loans with the proceeds from the sale of the Furon stock constituted a breach of its fiduciary duty.

With its answer, the Trustee filed counterclaims against the Benefits Committee seeking a declaratory judgment that (1) the Trustee is precluded by ERISA from using the proceeds from the sale of the Furon stock in the Subfund to repay the Exempt loans; (2) the Trust Agreement requires the

The Furon ESOP did not provide an immediate or complete benefit to the participants. The ESOP borrowed the money from the Company in order to buy a block of stock at one time. The participants' interest in that block of stock was nil at first. Each year, pursuant to a myriad of vesting and allocation criteria, the participants received an interest in the ESOP, which manifested itself in the allocation of that interest from the Subfund to the respective participants' individual accounts. The participants had no right to any portion of the Subfund, only their individual accounts. As a result of the complete acquisition of Furon by Saint-Gobain, 95% of Furon stock was tendered for cash, including the stock held in the ESOP both by the individual accounts and the Subfund. This acquisition resulted in stock previously traded at $16.31 being exchanged for $25.50 per share, a 56% increase in value. Saint-Gobain, the new owner of Furon and, as a result, sponsor of the ESOP, elected to terminate the ESOP. Such termination was a business decision clearly within its discretion. *See Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995) ("[The] decision to terminate the ESOP . . . is considered to be a "pure business decision."). When the Furon ESOP was terminated, Saint-Gobain, the plan sponsor, was no longer permitted to make tax-deductible contributions to the ESOP and, further, the terms of the ESOP prohibited further contributions. Without further contributions, the participants ceased to accrue benefits, and their account balance increased only by interest earned on the value of the individual accounts. Under the Furon ESOP, the participants are entitled to the money remaining in the Subfund after payment of the Exempt loan. That money, a result of the premium paid for the stock by Saint-Gobain, has been distributed to the participants at the direction of the Benefits Committee in the amount of $4 million. Further, pursuant to the direction of the Benefits Committee, all of the individual accounts have been disbursed. All that remains in the Subfund – and Furon ESOP – is the approximate amount still owed to the company, $2.3 million. The only interest that the participants have in that money is a residual interest in the event that it cannot be paid, a sort of remainder interest.

*Lockheed Corp. v. Spink*, 517 U.S. 882, 887-88 (1996).

## VI.    Analysis

This case reduces to a single issue:  whether authorizing repayment by the Furon ESOP of its loan from the Company would cause the Trustee to violate its fiduciary obligations under ERISA to the participants of the Furon ESOP.

Nothing in the agreements related to the ESOP prohibits the Trust from repaying the loan.  The Furon ESOP requires the repayment, and the Trust Agreement permits the payment (using "may" rather than "must").  The Benefits Committee has directed the Trustee to make the payment.  The IRS agrees that the loans would retain their "exempt" status if the payment was made, and such payment would not be to the detriment of the participants of the plan.  The agreements do, quite obviously, except the requirement of any action that would violate ERISA.  Thus, the issue turns on what ERISA requires in this case.

The DOL weighs in on the side of the Trustee, arguing that the payment of the loan is not enforceable under the Loan Agreement and so payment of the loan would be a gratuitous transfer to the interested employer not for the sole benefit of the participants:  both imprudent and disloyal.  The Benefits Committee agrees that the Company could not legally enforce the loan because in order to be exempt under the regulations the loan must be without recourse, and the Company did not take a security interest in the unallocated stock and subsequent proceeds.  Nevertheless, the Benefits Committee objects to the denomination of the loan repayment as gratuitous.  The loan was made, remains outstanding and the agreements require its repayment.  Further, the Benefits Committee argues that the repayment of the loan does not harm the beneficiaries' interest, as they have no right to those assets.  This last point must be the touchstone of our fiduciary analysis, the effect of the proposed action on the participants.

Trustee to allocate the Subfund to the participants in the Furon ESOP in proportion to their current account balances; and (3) the Benefits Committee's instructions to use the Subfund to repay the Exempt Loans constitutes a breach of its fiduciary duties.

The parties filed cross-motions for summary judgment. The district court granted the motion of the Trustee and denied the motion of the Benefits Committee, holding that if the Trustee were to repay the Exempt Loans with the assets currently held in the Subfund, it would violate its fiduciary duties to the Furon ESOP participants under ERISA.  The Benefits Committee appealed.  The Department of Labor ("DOL") has intervened in this appeal as an *amicus curiae* in support of the Trustee's position.

## II.   Relevant Documents

### 1.    Trust Agreement

The Benefits Committee cites to § 3.3(g) of the Trust Agreement, which states,

[I]f at the date of termination of the Plan, the Trustee remains indebted under any Company Stock Loan, the Trustee *may* pay accrued interest and principal and prepay the remaining principal balance of the Company Stock Loan with Shares of such Plan held in the Suspense Subfund or with the proceeds of a sale or other disposition of such Shares. If any assets remain in the Suspense Subfund after all Company Stock Loans have been fully discharged, such assets will be allocated to the Accounts of Participants.

(emphasis added).  The language of this section is admittedly permissive rather than mandatory.

Section 3.3(d) of the Trust Agreement sets forth the allowed methods of recourse in the event of non-payment of

the Exempt Loans, quoting the limits on recourse in C.F.R. § 2550.408b-3(e):

> Under the terms of the Company Stock Loan or other documents executed by the Trustee in connection therewith, the lender shall not have recourse against the assets of the Trust Fund except that a Company Stock Loan may permit recourse with respect to (1) the collateral pledged as security for the Company Stock Loan, (2) contributions (other than contributions of shares) that are made to meet the Trustee's obligations under the Company Stock Loan, and (3) earnings attributable to such collateral and the investment of such contributions.

Because (1) no collateral was created, (2) there will be no further contributions, and (3) the Trust contains no earnings, Saint-Gobain Plastics has no recourse under § 3.3(d) of the Trust Agreement in the event of non-payment by the Trust.

Section 1.4 of the Trust Agreement states that the Furon ESOP and the Trust Agreement "shall be deemed to be and construed as a single document."

**2.   Loan Agreements**

The Trustee relies on § 5 of the 1997 Loan Agreement with the Company, which states, "Furon shall contribute to the Trustee amounts sufficient to enable the Trustee to timely pay the principal and any interest due and payable under Section 3 of this Loan Agreement." In addition, § 9 of the 1997 Loan Agreement sets forth the parties' remedies in case of default:

> (a) In the event of a default by the Trustee the full amount of the outstanding principal balance, accrued and unpaid interest (if any), and other sums then owing by the Trustee under the Note shall become immediately due and payable, without presentment, demand, protest or notice of any kind, provided, however, that Furon shall have no recourse against the assets of the Trust other than

. . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement--and if he has fulfilled whatever conditions are required to obtain a vested benefit--he actually will receive it." *Id.*, at 375, 100 S.Ct., at 1733. Accordingly, ERISA tries to "make as certain as possible that pension fund assets [will] be adequate" to meet expected benefits payments. *Ibid.*

To increase the chances that employers will be able to honor their benefits commitments--that is, to guard against the possibility of bankrupt pension funds--Congress incorporated several key measures into ERISA. Section 302 of ERISA sets minimum annual funding levels for all covered plans, *see* 29 U.S.C. §§ 1082(a), 1082(b), and creates tax liens in favor of such plans when those funding levels are not met, see § 1082(f). Sections 404 and 409 of ERISA impose respectively a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries. *See* §§ 1104(a), 1109(a). Finally, § 406 of ERISA prohibits fiduciaries from involving the plan and its assets in certain kinds of business deals. *See* § 1106. It is this last feature of ERISA that is at issue today.

Congress enacted § 406 "to bar categorically a transaction that [is] likely to injure the pension plan." *Commissioner v. Keystone Consol. Industries, Inc.*, 508 U.S. 152, 160, 113 S.Ct. 2006, 2012, 124 L.Ed.2d 71 (1993). That section mandates, in relevant part, that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).[2]

---

[2] Section 408 enumerates specific exceptions to the prohibitions in § 406. *See* 29 U.S.C. § 1108(b). Lockheed does not argue that any of these exceptions pertain to this case.

remittance of attorney's fees to the IBT would not benefit the IBT in the manner intended to be proscribed by the statute. A benefit is defined as an advantage, privilege, profit or gain. *See* Black's Law Dictionary 150 (7th ed. 1999). IBT would not receive a benefit in the context of the statutory framework involved in the instant case inasmuch as the transaction would merely constitute repayment for money already expended by IBT in support of Plaintiffs' suit against Defendants. Moreover, the IBT would receive the attorney's fees advanced without the payment of interest. IBT therefore does not stand to receive a profit or gain from the alleged "prohibited transaction." Indeed, the transaction at issue does not contain the "abuse" Congress sought to protect in promulgating § 406(a), as the transaction will not injure the plan.

*Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 859 (6th Cir. 2000).

As the court is faced with conflicting agency interpretations of the issue and little authority directly on point, it is helpful to also consider the purposes of the relevant ERISA and parallel Code provisions. The Supreme Court had occasion to discuss these purposes in a different context:

Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91, 103 S.Ct. 2890, 2896-2897, 77 L.Ed.2d 490 (1983); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits. As we said in *Nachman Corp. v. Pension Benefit Guaranty Corporation*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), when Congress enacted ERISA it "wanted to

(i) any cash contributions made by Furon under Section 5 and not previously paid to Furon as loan payments, (ii) any Shares that have not been released from the suspense account and (iii) the assets which may have resulted from the investment of the contributions referred to in (i). A breach of the representations and warranties under Section 7 above and the failure to make any scheduled payment of principal of or interest on the Notes (other than solely as a result of Furon's failure to make required contributions) shall constitute a default by the Trustee hereunder. . . .

(b) If Furon shall fail to make contributions as required under Section 5 of this Loan Agreement, the Trustee's obligation to pay principal and interest due and payable under Section 3 of this Loan Agreement shall be suspended until such contribution is made, and such contributions shall be first applied to any past due interest and principal.

The parties agree that the Trust's failure to repay the Exempt Loans does not constitute a default under the terms of the Loan Agreements because its failure to repay is the result of the termination of the ESOP and end of further contributions thereunder. Accordingly, the Trust's obligation under the Loan Agreements to make payments on the Exempt Loans has been suspended. It is also undisputed that the Company cannot make further contributions to the Furon ESOP pursuant to the restrictions of the Furon ESOP and the Code.

## 3. Furon ESOP

Section 16.15 of the Furon ESOP states,

In no event shall any part of the funds of the Plan be used for, or diverted to, any purpose other than for the exclusive benefit of Participants and their Beneficiaries under the Plan except as permitted under [29 U.S.C. § 1103(c) ] or other applicable law. Upon the transfer by a Participating Company of any money to the Trustee, all

interest of the Participating Company therein shall cease and terminate.

Further, it is conceded that the Company did not retain a security interest in the assets held in the Subfund as collateral for the Exempt Loans.

The Benefits Committee points to § 15.4 of the Furon ESOP, which states,

Upon or after termination of the Plan, the Board of Directors may terminate the Trust. Upon termination of the Plan, whether or not the Trust is then terminated, the Trustee may pay in a single lump sum to each Participant the full amount accredited to his individual Account. Upon the termination of the Plan, the unallocated Company Stock in the Suspense Subfund attributable to an Exempt Loan from the Company to the Trust, and any unallocated proceeds attributable to the sale or other disposition of such Company Stock, which proceeds are held in the Suspense Subfund, shall, to the extent the fair market value of such unallocated Company Stock and the amount of such unallocated proceeds does not exceed the unpaid amount of any outstanding Exempt Loan from the Company to the Trust and to the extent permitted by the Code and Regulations, be returned to the Company in full satisfaction of such Exempt Loan. To the extent such unallocated Company Stock and unallocated proceeds cannot be returned to the Company, or the fair market value of such unallocated Company Stock and proceeds exceed the Company Stock and proceeds returned to the Company in satisfaction of an outstanding Exempt Loan, it shall be allocated to the accounts of Participants upon termination of the Plan in proportion to their account balances. Without limiting the foregoing, any such distributions may be made in cash, Company Stock, other property, or any combination, as the Committee in its sole discretion may direct.

*Murdock*, 890 F.Supp. 444 (E.D.N.C. 1995), *aff'd*, 83 F.3d 415 (4th Cir. 1996). The court held:

This change [to the amendment] does not have an adverse or prohibited effect on the rights guaranteed to the participants under either the 1976 or 1979 Plan. The 1976 Plan never gave the participants the right to any surplus, so the change in the 1979 Plan giving any such surplus to the company did not serve to take any benefits from the participants.

Plaintiffs contend that the 1976 Plan language, even if it does not specifically prohibit the company from recovering surplus assets, does prohibit such recovery because the Plan was intended to provide benefits for its participants. The Fourth Circuit has held that a plan sponsor may amend a plan to add provisions allowing the company to recover surplus assets even when unambiguous plan language requires all actions to be in the exclusive interest of the beneficiaries.

*Id.* at 452 (citation omitted). Though the factual situation is different in that *Riley* concerned a defined benefit plan and an attempt by the company to recover surplus assets in the subfund, the reasoning applies. In this case, the Company is not seeking to recover the surplus that it has distributed to the participants. Instead, it seeks payment of the outstanding debt of the plan, money to which the participants have no right, as in *Riley*.

Addressing payment of attorneys' fees by an ERISA plan, this court generally addressed transactions likely to harm a plan:

In recognizing that the IBT is a party in interest here, the proper focus of the analysis is whether there is intent to benefit the IBT. We find that there is no such intent. The legislative history indicates that § 406 was intended to protect plan members by preventing fiduciaries from engaging in transactions that could hurt the plan. . . . The

expressly indicated that the general fiduciary requirements under ERISA and within the purview of the DOL were not considered.

As noted in the facts, the IRS has issued a favorable determination letter to the Benefits Committee regarding the proposed repayment at issue in this case. The relevance of the IRS's consideration of this issue is that in finding the prepayments at issue in the two opinion letters and favorable determination in this matter did not endanger the exempt status of the loans, the IRS necessarily determined that despite such prepayments, the loans did not lose their character as being primarily for the benefit of participants and beneficiaries of the plan. In other words, repayment of an exempt loan in a way not legally obligated does not adversely effect the benefits of participants and beneficiaries of the plan. Further, the 1994 letter recognized in the same takeover context, as in this case, that rather than being harmed, the participants reaped a tremendous benefit in the form of the premium paid on the securities held in the subfund as well as the securities held in their individual accounts.

**V.   Relevant Case Law**

There are no cases directly on point in this matter. The Trustee and DOL cite a number of fiduciary cases under ERISA addressing the extensive level of this duty. *See, e.g., Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995); *Donovan v. Bierwith*, 680 F.2d 263, 272 (2d Cir. 1982); *Dairy Fresh Corp. v. Poole*, No. 96-0187-CB-C, 2000 U.S. Dist. Lexis 11601, at *45 (S.D. Ala. 2000). The Benefits Committee cites several cases addressing issues with regard to defined benefit plans, which the Trustee claims distinguishes them. Perhaps the most instructive of these cases is a district court case from North Carolina. In that case, the Benefits Committee purchased an annuity to guarantee the benefits of the plan and amended the plan to provide that the surplus return to the company. *See Riley v.*

This provision was amended on March 17, 2000, with the only significant changes being (1) unallocated proceeds, as well as unallocated stock, are accounted for in the amended version; and (2) its provisions are triggered by termination of the Trust or termination of the Plan, regardless of whether the Trust is terminated.

**STANDARD OF REVIEW**

On appeal of a district court's grant of summary judgment on cross-motions for summary judgment, our role is identical to that of the district court. *Hand v. Cent. Transport, Inc.*, 779 F.2d 8, 10 (6th Cir. 1985). Our review is *de novo* since only questions of law are involved. *Pinney Dock and Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988).

**DISCUSSION**

**I.   ERISA and ESOPs**

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). ERISA regulates employee benefit plans, in part, by establishing strict standards of conduct, responsibilities and obligations for fiduciaries of the plans. 29 U.S.C. § 1001(b). An ESOP is one specific type of plan covered by the provisions of ERISA.

"An ESOP is a type of ERISA plan that invests primarily in the stock of the employer creating the plan." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994); *see also* 29 U.S.C. § 1107(d)(6). An employer desiring to create an ESOP is required to execute a written document to define the terms of the plan and the rights of the beneficiaries under it. 29 U.S.C. § 1102(a). This plan must also name one or more fiduciaries who are "to control and manage the operation and administration of the plan." *Id.* A

trust is established to hold the assets of the ESOP.  29 U.S.C. § 1103(a).

An ESOP's assets are often derived from tax-deductible contributions from the employer to the plan in the form of the employer's own stock or cash.  An ESOP may also borrow money from a third party in order to invest in the employer's stock.  *See* 29 U.S.C. § 1108(b)(3).  If cash is contributed, the ESOP then purchases stock in the sponsoring company.  This type of ESOP is called a leveraged ESOP and is the type of ESOP at issue in the present case.  If a leveraged ESOP is created, the employer is obligated to make cash contributions to the ESOP, which in turn uses the cash to retire the loan debt.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1459 (5th Cir. 1983).  In the present case, after the ESOP borrowed money for the amount of the stock purchase, the stock was placed in a "suspense subfund."  As the ESOP makes loan payments using the cash contributions from the Company, stock is released from the Subfund and placed into the ESOP participants' individual accounts.

## II.   Relevant Statutes under ERISA and the Code

Section 404(a)(1) of ERISA provides the relevant fiduciary obligations under the statute, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
> (A) for the exclusive purpose of:
>   (i) providing benefits to participants and their beneficiaries;
> . . .
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

requirement" based on all the surrounding facts and circumstances.

In the present case, no additional employer securities will be acquired subsequent to the tender offer because Company N has no intention of continuing to maintain the ESOP. Furthermore, a substantial premium was paid for the Company M employer securities. After the loan is repaid, the balance remaining in the suspense account will be distributed to Plan X participants and Plan X will then be terminated.

Accordingly, with respect to your requested ruling, we conclude, in the present case, that the proceeds from the sale, pursuant to the offer and merger, of the unallocated common stock in the Plan X suspense account can be used to repay the outstanding principal balance on the loan without causing the loan to fail to meet the exemption provided by section 4975(d)(3) of the Code.

1994 WL 141568 (no star paging provided).  In an earlier analogous situation, the IRS similarly held:

> We hold that the prepayment by an ESOP of an exempt loan made to the ESOP is consistent with the above quoted language of section 54.4975--7(b)(5) of the Regulations.  This section of the Regulations does not establish a per se prohibition against exempt loan prepayments by an ESOP.  It requires that if an ESOP contemplates prepaying an exempt loan, the funds used to prepay the loan must be limited to the assets (e.g., qualifying employer securities) acquired in the exempt loan transaction, whether or not those assets collateralized the exempt loan, plus income attributable to those assets (e.g., dividends, proceeds from a subsequent sale of the assets).  In prepaying the loan, in other words, the ESOP may not use its other general assets.

IRS Priv. Ltr. Rul. 8044074, 1980 WL 135505 (Aug. 11, 1980) (no star paging provided).  Both opinions, however,

1993 WL 562217, at *2 (footnote omitted). The 1997 letter parroted this analysis:

As the Department explained in Advisory Opinion 93-35A (December 23, 1993), the appropriate plan fiduciary must consider whether the lender has a security interest in the employer securities in the suspense account (or the proceeds from the sale thereof) in the event of default. In the absence of a determination by the plan fiduciary that the lender has an enforceable legal interest in the unallocated employer securities in the suspense account, repayment by the plan of the balance remaining on the loan through the sale or exchange of such securities would appear to violate ERISA sections 403(c)(1), 404(a)(1)(A), 404(a)(1)(B) and 406(a)(1)(D). The question of whether the lender has a security interest in the employer securities in the suspense account (or the proceeds from the sale thereof) is a question of state law interpretation.

1997 WL 1824020, at *3.

## IV.   IRS Private Letter Rulings

In two private letter rulings, the IRS addressed the parallel Code provision to ERISA § 406(a)(1)(D), regarding prohibited transactions, and the parallel exemption of that rule for qualifying ESOP loans in ERISA § 408(b)(3). *See* 26 U.S.C. § 4975(c)(1)(D), (d)(3). In the 1994 ruling, IRS Priv. Ltr. Rul. 9416043, 1994 WL 141568 (Apr. 22, 1994), addressing an almost identical situation to this case, the IRS concluded:

Section 54.4975-7(b)(6) provides for repayment of an exempt loan in the event of default. However, the exemption provided by section 4975(d)(3) of the Code, and described in the associated regulations will not fail to be met merely because a plan trustee sells employer securities and repays an exempt loan, not in default, if such transaction satisfies the "primary benefit

Section 406 of ERISA discusses prohibited transactions:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--
. . .
(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan . . . .

ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). There is a parallel provision in the Code. *See* 26 U.S.C. § 4975(c)(1)(D).

Section 403 of ERISA provides that: "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries . . . ." ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1). As quoted *infra*, § 16.15 of the Furon ESOP includes this same language.

Section 408 of ERISA provides a "safe harbor" exemption from the proscription of § 403:

(b) Enumeration of transactions exempted from section 1106 prohibitions

The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:
. . .
(3) A loan to an employee stock ownership plan (as defined in section 1107(d)(6) of this title), if--
(A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and
(B) such loan is at an interest rate which is not in excess of a reasonable rate.

If the plan gives collateral to a party in interest for such loan, such collateral may consist only of qualifying

employer securities (as defined in section 1107(d)(5) of this title).

ERISA § 408(b)(3), 29 U.S.C. § 1108(b)(3). As above with the list of prohibited transactions, there is a parallel exemption provision in the Code. *See* 26 U.S.C. § 4975(d)(3).

## III.    DOL Opinion Letters

The DOL has addressed the issue raised in this appeal in two opinion letters dated December 23, 1993 (the "1993 letter") and December 17, 1997 (the "1997 letter"). DOL Op. No. 93-35A, 1993 WL 562217 (ERISA Dec. 23, 1993); DOL Op. Ltr. A00420, 1997 WL 1824020 (Pension and Welfare Benefits Ass'n Dec. 17, 1997). Opinion letters need not be given deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Such letters may have persuasive value, however, if "thoroughly considered and well reasoned." *See, e.g., Elwell v. Univ. Hosp. Home Care Servs.*, 76 F. Supp. 2d 805, 808-809 (N.D. Ohio 1999) (stating that Department of Labor opinion was entitled to deference because it was "a thorough, well reasoned and accurate interpretation of the [relevant] regulation"); *cf. Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 303 (6th Cir. 1998) ("The opinion letters here fail to persuade us because they do not explain the statutory source for the limitation that they create.").

Both opinion letters deal with an issue concerning which funds can be used to repay the loans under the DOL regulations. Though also originally raised in this case, this issue was resolved by the district court in favor of the Benefits Committee and not challenged on appeal by the Trustee or the DOL. Specifically, "while 2550.408b-3(e) precludes recourse to other than the above-enumerated assets of the ESOP by persons entitled to repayment of a loan that is exempt under [29 U.S.C. § 1108], it does not serve to limit the use of other assets by the fiduciary of an employee stock

ownership plan to repay an exempt loan." 1993 WL 562217, at *1; 1997 WL 1824020, at *2 ("The Department believes that the ESOP loan would not fail to be exempt solely because the appropriate plan fiduciary used assets of the ESOP other than those enumerated in section 2550.408b-3(e) to repay the loan.").

After determining that use of subfund assets did not violate DOL regulations interpreting ERISA § 408, the 1993 letter turned to the fiduciary question relevant to this appeal. The opinion letter quoted in full the relevant ERISA provisions related to this question, including §§ 403, 404 and 406. Then, the opinion letter proceeded with its analysis, which due to its brevity can be quoted in full here:

> The appropriate plan fiduciary must consider the application of these provisions to the facts and circumstances of this case. In particular, the fiduciary must ascertain under the above-described circumstances whether the lender has recourse to employer securities in the suspense account (or proceeds received from the sale of such securities) in the event of default -- i.e., whether the securities serve as collateral for the loan.[1] In the absence of such a determination, repayment by the plan of the balance remaining on the loan would appear to violate ERISA sections 403(c)(1), 404(a)(1)(A), 404(a)(1)(B) and 406(a)(1)(D) because, assuming the loan complied with the terms of 29 C.F.R. 2550.408b-3, the lender would have no right to employer securities held in the suspense account and the plan would have no legal obligation to repay the loan with the proceeds from the sale of the securities.

---

[1] Notwithstanding collateralization of the loan by the unallocated employer securities in the suspense account, other fiduciary duties under Title I of ERISA may be implicated when considering the sale of such securities to service the exempt loan debt.